# In the United States Court of Federal Claims

No. 20-749C

(Filed Under Seal: June 24, 2021)

(Reissued: July 1, 2021)

|  |  |
|---|---|
| WAVELINK, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| KALMAN & COMPANY, INC., | ) |
| RESEARCH & ENGINEERING DEVELOPMENT LLC, | ) |
| NOVA TECHNOLOGIES AN EMPLOYEE OWNED ENGINEERING COMPANY, | ) |
| ISYS, INC., | ) |
| NETCENTRIC TECHNOLOGY, LLC, | ) |
| GAN CORP., | ) |
| BOECORE, INC., and | ) |
| DUCOM, INC. | ) |
| Defendant-Intervenors. | ) |

*Christopher L. Lockwood*, Wilmer & Lee, P.A., Huntsville, AL, for Plaintiff. With him on the briefs were *Jerome S. Gabig* and *Richard J.R. Raleigh, Jr.*

*Liridona Sinani*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With her on the briefs were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, Civil Division, *Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and *Stephen T. O'Neal*, Assistant General Counsel, Office of General Counsel (LP), General Services Administration, Washington, D.C.

*Bryant S. Banes*, Neel, Hooper & Banes, P.C., Houston, TX, for Defendant-Intervenor Kalman & Company, Inc.  With him on the brief was *Sarah P. Harris*.

*Frank S. Murray*, Foley & Lardner LLP, Washington, D.C., for Defendant-Intervenor Research & Engineering Development LLC.  With him on the brief were *David T. Ralston, Jr.* and *Julia Di Vito*.

*Katherine B. Burrows*, PilieroMazza PLLC, Washington, D.C., for Defendant-Intervenor Nova Technologies An Employee Owned Engineering Company.  With her on the brief were *Timothy F. Valley*, *Camilla J. Hundley*, and *Anna G. Sullivan*.

*Dawn E Stern*, DLA Piper LLP, Washington, D.C., for Defendant-Intervenor ISYS, Inc. With her on the brief were *C. Bradford Jorgensen* and *Thomas E. Daley*.

*Damien C. Specht*, Morrison & Foerster LLP, Washington, D.C., for Defendant-Intervenor NetCentric Technology, LLC.  With him on the brief were *James A. Tucker* and *Rachael K. Plymale*.

*Jon D. Levin*, Maynard, Cooper & Gale, P.C., Huntsville, AL, for Defendant-Intervenor GaN Corp.  With him on the brief were *W. Brad English*, *J. Dale Gipson*, *Emily J. Chancey*, and *Nicholas P. Greer*.

*Ryan J. Klein*, Sherman & Howard LLC, Colorado Springs, CO, for Defendant-Intervenor Boecore, Inc.

*Joseph L. Katz*, Katz Law, Bethesda, MD, for Defendant-Intervenor DUCOM, Inc.

## OPINION AND ORDER

*SOLOMSON*, **Judge.**

        This post-award bid protest is yet another such case arising from the recent on-ramp procurement process for Pools 1, 3, and 4 of the One Acquisition Solution for Integrated Services Small Business ("OASIS SB") contract vehicle.  Plaintiff, WaveLink, Inc. ("WaveLink"), submitted proposals for Pools 1 and 3, and alleges that Defendant, the United States, acting by and through the General Services Administration ("GSA" or the "Agency"):  (1) improperly failed to allow WaveLink to update its relevant experience and past performance proposal volumes during the 10-month proposal evaluation period; (2) violated Federal Acquisition Regulation ("FAR") provisions in conducting discussions with other offerors without allowing all offerors, including WaveLink, to submit a fully revised proposal, known as a final proposal revision ("FPR");[1] and (3) erred in awarding contracts to ineligible offerors, in violation of a

_____

[1] *See* FAR 15.307(b) ("At the conclusions of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision.").

mandatory solicitation provision and the FAR. The government counters that GSA acted reasonably in evaluating all the proposals submitted during the OASIS SB on-ramp procurement, did not conduct discussions with any offeror, and did not award contracts in derogation of a mandatory solicitation requirement. The government further argues that even if GSA in fact conducted discussions or should have issued an amendment to eliminate a mandatory requirement, the Agency would not have been required to allow WaveLink to fully revise its proposal with updated content.

Both parties filed motions for judgment on the administrative record pursuant to Rule 52.1 of the Court of Federal Claims ("RCFC"). The government moved to dismiss WaveLink's amended complaint for lack of standing pursuant to RCFC 12(b)(1).

The Court concludes that while the bulk of WaveLink's claims are not meritorious, WaveLink demonstrates that GSA awarded contracts to offerors contrary to mandatory terms of the OASIS SB solicitation, thus violating FAR 15.305(a) and 15.206(d). As a result, WaveLink was prejudicially deprived of its opportunity to fairly compete for a contract award in Pool 3. While the Court understands the government's desire for maximum flexibility in conducting its procurements, these FAR provisions are "essentially corollaries of a basic rule designed to promote fair competition, particularly in the context of negotiated, best value procurements." *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 225 (2005). As the United States Supreme Court recently observed, "[i]f men must turn square corners when they deal with the government, *it cannot be too much to expect the government to turn square corners when it deals with them*." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021) (emphasis added).

Accordingly, and for the reasons explained below, the Court **DENIES** the government's motion to dismiss, **GRANTS, IN PART,** and **DENIES, IN PART,** WaveLink's motion for judgment on the administrative record, and **GRANTS, IN PART,** and **DENIES, IN PART,** the government's motion for judgment on the administrative record.[2]

---

[2] On May 7, 2021, the Court originally filed, under seal, an opinion and order, finding for Plaintiff on the merits and issuing limited injunctive relief. Before the Court publicly released that opinion, however, the Court learned, for the first time, that the contract awardees potentially impacted by the injunction had not been notified of the instant bid protest action. The Court accordingly stayed the injunction and ordered the government to notify those awardees, eight of which ultimately intervened in this case. The Court then provided those intervenors the opportunity to file a brief and held a status conference with all of the parties. Upon considering the defendant-intervenors' arguments, the Court issued, under seal, this revised opinion and order in place of ECF No. 57, which the Clerk, by separate order, was directed to strike from the record. ECF No. 113. The Court provided the parties until July 1, 2021, to propose redactions. On July 1, 2021, the parties filed joint proposed redactions, ECF

## I.    Factual And Procedural Background[3]

### A.    The Solicitation

OASIS SB is a GSA-administered, government-wide contract vehicle that provides federal government agencies with access to a range of professional, scientific, and technical services.  AR 1187–93.  OASIS SB is a 100% small business set-aside, consisting of seven separate multiple award, indefinite delivery indefinite quantity ("IDIQ") contracts, referred to as "Pools."  AR 412–13, 1186.  Each Pool covers a different industry discipline and is reserved for a small business size standard based either on annual revenue or number of employees.[4]  AR 1207–09.  In July 2013, GSA originally issued OASIS SB, Solicitation No. GS00Q-13-DR-0002, as a Request for Proposals (the "Solicitation" or the "RFP").  AR 40, 1108, 1122.  In March 2014, GSA awarded numerous contracts across the seven Pools, including 44 in Pool 1, 43 in Pool 3, and 40 in Pool 4.  AR 6934, 6996.  Awardees were then eligible to bid on various task orders within their respective Pools.  AR 5, 49.

The RFP authorized GSA to reopen any of the individual OASIS SB Pools to "on-ramp" additional contractors.[5]  AR 458.  Consistent with that RFP provision, on April 29, 2019, GSA initiated an on-ramping process for Pools 1, 3, and 4, seeking an additional 190 contractors in Pool 1, 160 contractors in Pool 3, and 60 contractors in Pool 4.  AR 288, 388, 6996.  In the event of a tie for the last slot in each Pool, all tied offerors would be awarded a contract.  AR 49, 388.  Pools 1, 3, and 4 were structured as "separate contract actions and separate procurements in and of themselves."  AR 6996.  Notwithstanding that a protest in one Pool would not necessarily impact a different Pool, "decisions made regarding GSA's evaluation of any one Pool can have a significant impact on the other Pools as the evaluation criteria are identical for all three Pools."  AR 7002.  Offerors were permitted to submit proposals for more than one Pool.

---

No. 115, which this Court adopts and accordingly reissues this public version of this opinion and order.

[3] This background section constitutes the Court's findings of fact drawn from the administrative record.  *See infra* Section III.  Citations to the administrative record (ECF No. 22, as amended by ECF No. 45) are denoted as "AR".

[4] These designations were made utilizing the North American Industry Classification System ("NAICS") codes with the corresponding small business size standards, as developed by the Small Business Administration.  *See* 13 C.F.R. § 121.201.

[5] Although GSA did not issue a new RFP, *see* AR 6997, the on-ramp process constituted a new procurement process.  *See DigiFlight v. United States*, 150 Fed. Cl. 650, 652 (2020).

AR 49, 121. Proposals for the on-ramp procurement originally were due by June 20, 2019, but GSA subsequently extended the closing date to June 28, 2019. AR 348, 7001.

The RFP required each proposal to contain six distinct volumes, which GSA labeled as follows: (1) general; (2) responsibility; (3) relevant experience; (4) past performance; (5) systems, certifications, and clearances; and (6) cost/price. AR 286–87. As part of the responsibility volume, the Solicitation instructed offerors, among other things, to submit financial statements. AR 366–67. The RFP was a "best value" procurement with contracts awarded to the "Highest Technically Rated Offerors with a Fair and Reasonable Price." AR 388. The RFP provided that only the relevant experience, past performance, and systems, certifications, and clearances volumes would be scored, whereas the first two volumes (general and responsibility) would be graded as acceptable or unacceptable. AR 391, 400–01. Offerors' cost/price was assessed for reasonableness but was not weighed against the technical score. AR 389, 1245.

The RFP instructed offerors to submit their proposals using the OASIS Symphony Online Proposal System ("Symphony"). AR 40, 270–79, 348, 1247. Offerors utilized Symphony to input their proposal information along with supporting documentation. AR 276. Based on that information, Symphony generated a self-score for the scored portions of the RFP (*i.e.*, volumes three, four, and five) that an offeror could view before submitting its proposal. *Id.*; *see* AR 359, 490, 1268. The maximum available score was 10,000 points, including 4,000 points for relevant experience, 4,000 points for past performance, and 2,000 points for systems, certifications, and clearances. AR 400–01; *see also* AR 1112–119.

Beyond these general terms, there are several RFP provisions pertinent to this case: (1) the professional employee compensation plan provision; (2) the relevant experience "one-year period of performance" provision; (3) the CMMI certificate provision; and (4) the direct labor rate provisions.

### 1. Professional Employee Compensation Plan Provision

The RFP required offerors to submit, as part of the general volume, a professional employee compensation plan. AR 360; *see id.* at 355 ("To be eligible for an award, the Offeror shall adhere to the directions and submit the following information under Volume 1 – General."). Because "compensation that is unrealistically low . . . may impair the Contractor's ability to attract and retain competent professional service employees[,]" the RFP mandated that a compensation plan provide "the Offeror's methodology for determining salaries and fringe benefits for their professional employees in preparation for future task Order Requirements[.]" AR 360.

## 2. Relevant Experience "One-Year Period of Performance" Provision

At a minimum, the RFP required that proposals contain three primary, relevant experience projects that met certain basic criteria. AR 368–71. Among other things, each primary project "must have [had] at least 1 year of performance" unless one of three exceptions applied. AR 370. In the series of questions-and-answers ("Q&As") that GSA provided to potential offerors as part of the procurement process (and as an amendment to the RFP), GSA clarified that the one year of performance would be calculated "from the date of solicitation closing," and not from the on-ramp award date. AR 697. Thus, for an offeror to claim and ultimately receive experience credit for a particular project, a one-year period of performance had to be completed before the proposal due date. Upon meeting the minimum conditions, an offeror would be awarded base points for each primary project and could obtain additional points based on the size and complexity of the project. AR 370, 392–95. Offerors could include up to five primary, and additional secondary, relevant experience projects. AR 368, 377.

The RFP further provided that an offeror's past performance evaluation and scoring would be based only on eligible relevant experience primary projects. AR 381, 392. Again, past performance points would be dependent entirely upon a primary project's one-year period of performance prior to the proposal submission.

## 3. CMMI Certificate Provision

As part of the systems, certifications, and clearances volume, the RFP provided that aside from the section addressing accounting systems, all other items in this volume were "not minimum or mandatory requirements." AR 398. On the other hand, the RFP informed offerors that proposals "who have approved Systems, Certifications and Clearances will be considered more favorably." AR 398–99. The RFP outlined various systems, certifications, and clearances that would be eligible for points, including a Capability Maturity Model Integration ("CMMI") certification – a process improvement and appraisal program administered by the CMMI Institute.[6] AR 399; *see* AR 325 ("CMMI Certification is not mandatory; however, Contractors are encouraged to have CMMI Maturity Level 2 or higher in acquisition, services, and/or development during the entire term of OASIS SB."). For offerors claiming CMMI certification, the RFP specified that CMMI Maturity Level 2 was worth 100 points, while Level 3 or higher was worth 200 points. AR 399.

---

[6] *See* https://cmmiinstitute.com/ (last visited Apr. 23, 2021).

### 4. Direct Labor Rate Provisions

The Solicitation required offerors, in the cost/price volume, to propose a single direct labor rate for each of the 104 labor categories identified in the RFP.[7]  AR 399.  For purposes of determining whether a direct labor was "fair and reasonable," the RFP provided a table of labor rate ranges, based on the Bureau of Labor Statistics' National Estimate, for each labor category.  AR 386–87, 399.  All proposed direct labor rates were "strongly encouraged" to be within those ranges.  AR 387.  For any proposed direct labor rate that was outside of the indicated range (whether high or low), the RFP "strongly advised [offerors] to provide [a] clear and convincing rationale[,]" and specified consequences for failing to do so.  AR 399.  In that regard, the RFP emphasized:

> CAUTION: Failure to provide clear and convincing rationale to support a lower or higher direct labor rate outside the ranges set forth in [the RFP], *will* result in a determination the rate(s) are not fair and reasonable and the Offeror would not be eligible for award regardless of their technical score.

AR 387 (emphasis added); *see also* AR 399 ("In the event the rationale is not determined reasonable, the proposal will be deemed to have a ceiling rate(s) that is not considered fair and reasonable and the proposal would not be eligible for award, regardless of technical score.").

In the series of Q&As that GSA issued, a potential offeror inquired about what type of rationale was necessary for justifying rates that were either higher or lower than the ranges that the RFP provided.  AR 676.  In response, GSA did not provide a specific level of detail that offerors were required to include and instead referred potential offerors to the relevant RFP language.  *Id.*  The record does not reflect that any prospective offerors challenged the mandatory rationale language as improperly ambiguous or otherwise contrary to law.

### B.   The RFP's Evaluation Process

The RFP set forth the process for screening and evaluating each of the submitted proposals, consisting of the following steps:

*First*, an evaluation team initially screened all offers to "verify that a support document exists for all the evaluation criteria in accordance with the Offeror's proposal

---

[7] A direct labor rate is a "labor rate[] that [is] not burdened with Indirect Rates such as Fringe Benefits, Overhead, General and Administrative expenses, and/or Profit."  AR 386.

and compare it to the Offeror's Self Scoring." AR 389. The RFP clearly indicated that "[a]ny discrepancies will be treated as clarifications." *Id.* Only if a proposal omitted information regarding minimum submission requirements or otherwise did not comply with those requirements would a proposal be removed from consideration. *Id.*

*Second*, all offerors were assigned a "preliminary score" based on the Symphony self-score and then sorted from the highest score to the lowest score. *Id.*

*Third*, the highest-scored offerors were identified and ranked in each Pool based on the anticipated number of awards in each Pool (*i.e.*, 190 for Pool 1, 160 for Pool 3, and 60 for Pool 4). *Id.* Starting from the highest-scored offeror, each proposal was reviewed for compliance with the RFP's minimum requirements and documentation instructions. AR 389–92. Any offeror with a proposal that failed the acceptability review was removed from consideration and the next highest-rated offeror moved up in ranking in place of the eliminated offeror. AR 389.

*Fourth*, the Agency verified and validated the highest-scored offerors' self-scores. *Id.* Any claimed points that could not be substantiated led to the Agency's deducting those points and re-ranking the highest-scored offerors (*i.e.*, based on the revised score(s)). AR 389.

*Fifth*, after validating the scores of the putative awardees in each Pool, the Agency assessed the cost/price of the highest-scored offerors for fairness and reasonableness. *Id.* Failure to provide a fair and reasonable cost/price – *or the required rationale for prices outside of the specified range* – would lead to mandatory "eliminat[ion] from further consideration for award unless discussions are conducted." *Id.*

The RFP informed offerors that GSA "intends to award contracts without discussions" but that it "reserves the right to conduct discussions if determined necessary." AR 388; *see also* AR 399 ("Cost/Price proposals may only be modified as a result of discussions and Offerors are advised that the Government intends to make awards based on initial proposals without discussions."). The RFP also notified offerors that while GSA intends to award all of the contracts for each Pool simultaneously, GSA retains the discretion "to screen, evaluate, and award offers on a rolling basis if determined to be in the best interest of the Government." AR 390.

### C. The Evaluation of Proposals, Initial Contract Awards, GAO Protests, And Final Contract Awards

On June 27, 2019, WaveLink, a Huntsville, Alabama-based small business, submitted timely, identical proposals for Pools 1 and 3. AR 1281. Symphony calculated WaveLink's self-score for both Pools to be [**]. AR 7922–25, 7945–48. That score was

comprised of a claimed [**] points for relevant experience, 4,000 points for past performance, and [**] points for systems, certifications, and clearances. *See* ECF No. 1-1.

Including WaveLink, GSA received a total of 1,072 proposals: 663 proposals for Pool 1; 284 proposals for Pool 3; and 125 proposals for Pool 4. AR 6999. From the July 28, 2019 closing date until October 2, 2019, GSA screened and preliminarily ranked all of the offerors in the three Pools and began evaluating the highest-ranked offerors using the steps outlined above. AR 6940, 7002. Upon determining that 28 of the originally awarded contractors in Pool 1 were no longer eligible for task orders due to their small business status, GSA decided to make Pool 1 awards on a rolling basis in three phases. AR 2397–98. On November 15, 2019, GSA awarded Pool 1 contracts to the highest-ranked 40 offerors that did not require clarifications. AR 6820, 6952–53. From mid-November until January 14, 2020, GSA issued clarification letters to 69 of the next highest-ranked offerors and continued evaluating offerors. AR 6959–60. One offeror, NetCentric Technology, LLC ("NetCentric"), received a clarification letter, in which GSA asked NetCentric to identify where in its proposal it provided a supporting rationale for its [**] direct labor rates that were below the RFP's specified range. AR 9148–49. In response, NetCentric directed the Agency to its professional employee compensation plan, which contained a "bottoms-up rationale" for all of NetCentric's direct labor rates. AR 9151–52. On February 13, 2020, GSA awarded additional Pool 1 contracts to the next highest-rated, 89 offerors that submitted compliant proposals. AR 6820, 6978–82.

That same day, GSA also issued 16 unsuccessful notification letters to offerors that were no longer eligible for an award. AR 6821. Four of the unsuccessful offerors – NetCentric, Digiscient Corp. ("Digiscient"), People, Technology and Processes, LLC ("PTP"), and Technology, Automation & Management, Inc. ("TeAM") – were eliminated for proposing direct labor rates for certain labor categories that were below the low-end of the RFP's specified labor rate range, without providing a supporting justification. *Id.* Specifically, in the Agency's subsequent February 19, 2020 debriefing letter to NetCentric, GSA rejected NetCentric's reliance on its professional employee compensation plan as a rationale for the low direct labor rates, explaining as follows:

> A review of your Professional Employee Compensation Plan shows that the plan merely provides an explanation of the offeror's pricing methodology and labor and burden rates estimating practice, which is required by every offeror, *but does not satisfy the independent requirement that offerors who are proposing rates outside of the Section J.2 ranges supply a clear and convincing rationale for their rates.* At no point in your proposal does your Professional Employee Compensation Plan

> acknowledge the deviation and attempt to provide a clear and
> convincing rationale, it merely outlines the general
> methodology for developing rates.

AR 9156–57 (emphasis added). NetCentric, PTP, and TeAM separately filed protests with the Government Accountability Office ("GAO"), arguing, among other things, that the RFP required GSA to determine whether their rates were fair and reasonable, irrespective of whether the proposed rates were outside of the specified range and even if the offeror did not provide the required rationale for rates outside of that range. *See* AR 9120–34, 9355–57, 9524–26. On March 6, 2020, GSA requested that GAO dismiss NetCentric's protest, contending it was an untimely challenge to the RFP's clear instructions that a proposal with a direct labor rate below the range would not be found fair and reasonable and would be eliminated in the absence of a sufficient justification for the out-of-range rate. AR 9168–72. On March 11, 2020, GAO denied GSA's dismissal request, *without explanation*, notifying the parties that "[t]he agency's interpretation of the terms of the solicitation is a matter that we will resolve on the merits." AR 9346.

On March 16, 2020, GSA issued separate notices of corrective action in all three GAO protests, providing:

> GSA will re-evaluate Protester's direct labor rates for fairness
> and reasonableness. *In conducting this re-evaluation, GSA will
> not consider direct labor rates that are below the ranges provided in
> the Solicitation as unfair or unreasonable.* GSA's corrective
> action resolves all Protest grounds and renders the Protest
> academic.

AR 9347, 9510, 9673 (emphasis added). GAO subsequently dismissed each of the protests, finding that GSA's corrective action rendered the protests academic. AR 9349–50, 9512–13, 9675–76.[8]

GSA issued further clarification letters to the remaining highest-ranked offerors with unresolved issues in Pool 1. AR 2583, 6900. Among those that received clarification letters were five offerors with proposed direct labor rates above the RFP's labor rate range, *see* AR 6903, 6914, 6928, 6930, one offeror that omitted a labor rate, *see*

---

[8] A fourth eliminated offeror, Digiscient, also filed a GAO protest, arguing that its two direct labor rates that were below the RFP's range were "obvious" typographical errors. AR 9085–92, 9103–12. Although Digiscient did not contest GSA's interpretation or application of the RFP terms, GSA determined that its intended corrective action would cover this protest as well and, accordingly, GAO similarly dismissed Digiscient's protest as academic. AR 9115, 9117.

AR 6904, five offerors that omitted financial statements, *see* AR 6907, 6914, 6919–20, 6926, 6928, and one offeror that omitted its CMMI certificate documentation. *See* AR 6927. GSA also sent clarification letters to offerors amongst the highest-ranked in Pool 3, including one offeror that had proposed a direct labor rate above the RFP's labor rate range, as well as to the highest-ranked offerors in Pool 4. AR 2750, 2873, 7109–10.

On April 29, 2020, GSA awarded the remaining Pool 1 contracts to 84 offerors, including 20 offerors that tied for the last slot (*i.e.*, what would have been the 190th awardee) with a score of 6,350 points, yielding a total of 210 contracts. AR 6820, 6825. Consistent with GSA's "corrective action" described *supra*, GSA awarded contracts to 12 offerors that proposed direct labor rates below the RFP's labor rate range. *See* AR 6839–40, 6906–09, 6912, 6914, 6922, 6927. That same day, GSA awarded 163 contracts in Pool 3, including ties for the final slot with a score of 6,350 points.[9] AR 6996, 7005. Again, consistent with GSA's "corrective action" reading of the Solicitation, GSA awarded contracts to 18 offerors with direct labor rates below the RFP's labor rate range. *See* AR 9080. Although three of these awardees pointed to their professional employee compensation plans as the supporting rationale for their direct labor rates that were below the RFP's labor rate range, GSA did not evaluate these rationales, having already determined that the low rates were fair and reasonable *per se*. AR 7109, 7112. GSA also awarded 62 contracts in Pool 4. AR 7018.

On May 26, 2020, GSA notified WaveLink that its proposal was not selected for an award because its score of [**] was below the 6,350-score threshold for an award in Pools 1 and 3. AR 7172–73. Seventy-two offerors ranked ahead of WaveLink in Pool 1, but only 19 offerors ranked ahead of WaveLink in Pool 3. AR 6803–06, 9081.

### D. Procedural History

On June 23, 2020, WaveLink filed its complaint against the United States in this Court.[10] ECF No. 1. Following the government's filing of the administrative record on July 28, 2020,[11] ECF No. 22, WaveLink amended its complaint on August 10, 2020. ECF

---

[9] That the minimum point thresholds for an award in Pools 1 and 3 were identical appears to have been purely coincidental.

[10] This case originally was assigned to Judge Wheeler. ECF No. 2. DigiFlight, Inc., another offeror with a protest case before the undersigned, filed a directly related case notice. ECF No. 15. Accordingly, the instant case was transferred on July 9, 2020, to the undersigned Judge, but it was not consolidated with DigiFlight's matter. ECF Nos. 16, 17.

[11] The government subsequently amended the administrative record four times. ECF Nos. 25, 32, 33, 43. On January 7, 2021, the government refiled in a single, consolidated filing all of the amendments to the administrative record. ECF No. 45.

No. 23 ("Am. Compl.").  In the amended complaint, WaveLink alleges that the Agency: (1) acted arbitrarily and capriciously by not allowing WaveLink to update its relevant experience and past performance proposal volumes during the 10-month evaluation period; (2) violated the FAR in conducting discussions with other offerors without allowing all offerors, including WaveLink, to submit a FPR (including updated relevant experience and past performance volumes); and (3) erred by not enforcing a mandatory solicitation requirement, resulting in unlawful contract awards to ineligible offerors, or, in the alternative, in failing to issue a Solicitation amendment to delete the mandatory requirement.  Am. Compl. at ¶¶ 33–89.

In support of WaveLink's claims, WaveLink submitted a sworn declaration from Paul Gibbs, WaveLink's vice president of engineering.  ECF No. 1-1.  Mr. Gibbs avers that, based on WaveLink's projects in-process at the time its proposal was submitted, WaveLink would have been able to claim an additional [**] relevant experience points and would have qualified for a contract award in both Pools 1 and 3, had GSA permitted WaveLink to submit a revised, updated proposal.  *Id.* at ¶¶ 12–13.  WaveLink seeks a permanent injunction, preventing GSA from proceeding with the contract awards in Pools 1 and 3, allowing WaveLink to update its proposal, requiring GSA to reevaluate that proposal (and to award WaveLink a contract if the updated score exceeds the minimum threshold for an award), in addition to "[a]ny other relief this Court deems just and proper."  Am. Compl. at 16–17.

On August 26, 2020, WaveLink filed its motion for judgment on the administrative record.  ECF No. 27 ("Pl. MJAR").  On September 23, 2020, the government filed its motion to dismiss for lack of standing pursuant to RCFC 12(b)(1) or, in the alternative, a cross-motion for judgment on the administrative record.  ECF No. 30 ("Def. MJAR").  The parties filed their respective response briefs.  ECF Nos. 34 ("Pl. Resp."), 37 ("Def. Reply").  On December 10, 2020, the Court held oral argument.  ECF No. 39.  Following oral argument, the Court ordered supplemental briefing to address a variety of specific factual and legal issues that had not been sufficiently covered in the parties' briefs or at oral argument.  ECF No. 40.  Among other subjects, the Court ordered briefing on whether GSA was required to amend the RFP before accepting proposals with direct labor rates below the range and whether all offerors are entitled to submit a fully revised proposal following an agency's amending a solicitation.  *Id.* at 2–4.  The parties filed their supplemental briefs, ECF Nos. 46 ("Pl. Supp. Br."), 48 ("Def. Supp. Br."), and, after obtaining leave of the Court, WaveLink filed a supplemental reply brief.  ECF No. 51 ("Pl. Supp. Reply").  On February 25, 2021, the Court held further oral argument.  ECF No. 53.

### E. The Intervenors Join The Case

On May 7, 2021, the Court issued a sealed opinion and order, granting, in part, WaveLink's MJAR and issuing injunctive relief. ECF No. 57. In that opinion and order, the Court concluded, as explained *infra*, that GSA did not comply with mandatory solicitation requirements in awarding contracts to 18 offerors in Pool 3 that proposed direct labor rates below the suggested range without an accompanying rationale and that WaveLink was prejudiced because, absent discussions or a solicitation amendment, GSA should have eliminated these ineligible 18 offerors that were improperly awarded contracts ahead of WaveLink. *Id.* On May 13, 2021, the government filed a motion, requesting clarification regarding the scope of the Court's ordered injunction, to which WaveLink filed a response. ECF Nos. 58, 59. The next day, on May 14, 2021, the Court held a status conference with the parties. Minute Order (May 13, 2021).

During that status conference, the Court learned, for the first time, that neither WaveLink nor the government ever informed these 18 contract awardees about the filing of the instant bid protest. The Court concluded, that due process considerations required staying the previously ordered injunctive relief to provide the potentially impacted awardees with an opportunity to intervene. Accordingly, the Court further directed the government to notify the 18 impacted contract awardees regarding this case and provided each of them an opportunity to file a motion to intervene. ECF No. 62. Ultimately, eight such awardees filed timely motions to intervene, all of which were granted. ECF No. 63 (Kalman & Company, Inc. ("Kalman")); ECF No. 67 (Research and Engineering Development LLC ("RED")); ECF No. 72 (Nova Technologies An Employee Owned Engineering Company ("Nova")); ECF No. 78 (ISYS, Inc. ("ISYS")); ECF No. 83 (NetCentric); ECF No. 89 (GaN Corp. ("GaN")); ECF No. 96 (Boecore, Inc.); ECF No. 99 (DUCOM, Inc.). The Court provided each defendant-intervenor the opportunity to file a brief to present their respective views on the Court's May 7, 2021 decision. ECF No. 101.

On June 9, 2021, six of the eight defendant-intervenors filed briefs with the Court. *See* ECF No. 104 ("ISYS Br."); ECF No. 105 ("Kalman Br."); ECF No. 106 ("NetCentric Br."); ECF No. 107 ("RED Br."); ECF No. 108 ("Nova Br."); ECF No. 109 ("GaN Br."). On June 16, 2021, the Court held a status conference with all of the parties, for the primary purpose of hearing argument from the defendant-intervenors that filed briefs. ECF No. 103.

## II. Jurisdiction And Standing

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, provides this Court with "jurisdiction to

render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012). To satisfy the "direct economic interest" requirement in a post-award bid protest, a plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

WaveLink was an actual bidder, as it submitted timely proposals for Pool 1 and Pool 3 before the June 28, 2019 deadline for proposals. AR 1281. WaveLink alleges that it was directly harmed in either of two concrete ways: (1) that the Agency failed to allow WaveLink to increase its score through updating its relevant experience and past performance points in Pool 1 and Pool 3 during an unreasonably lengthy evaluation period or via a FPR as a result of the alleged discussions or the amendment that the Agency should have issued; and (2) that, even if WaveLink's score would have remained the same, it would have been eligible for an award in Pool 3 because the Agency should have eliminated numerous ineligible offerors that were improperly awarded contracts ahead of WaveLink. Pl. MJAR at 23, 26, 30–32. In its supplemental brief, WaveLink further contends that even among the unsuccessful offerors ranked ahead of WaveLink, there were (a) two ineligible offerors due to their not having provided a rationale justifying direct labor rates below the RFP's rate range, and (b) three other offerors identified in GSA's evaluation spreadsheet as subject to "[r]emoval" from the competition. Pl. Supp. Br. at 12–16, 22 (citing AR 9081).

The government counters that WaveLink lacks a "direct economic interest" because "[t]here are 72 contractors in Pool 1 and 19 contractors in Pool 3 that had higher scores than WaveLink but did not receive an award" and "WaveLink's arguments . . . rest on the assumption that if GSA requested relevant experience and past performance information, no other contractors would claim additional points." Def. MJAR at 19–20; *see* Def. Reply at 2–4. Moreover, the government argues, with respect to Pool 3, that even if the Court concurs that certain offerors were ineligible based on their low direct labor rates (and the missing rationale for those rates), WaveLink still would have been outside of the 160 highest-ranked offerors. Def. Reply at 4–7. The government also disputes WaveLink's factual contention that the three offerors marked for "removal" were ineligible for an award. Def. Supp. Br. at 13–14.

As "standing is a threshold jurisdictional issue" and "prejudice (or injury) is a necessary element of standing[,]" *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002), the Court must address the government's motion to dismiss for lack of standing before reaching the merits of this case. *See Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits."). Although the prejudice inquiry for standing purposes is similar to the merits prejudice inquiry, at the early, jurisdictional stage the actual "lawfulness of the contested agency decisions is . . . wholly immaterial . . . . Rather, this showing turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true." *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 694–95 (2010); *see L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 289 (2011) ("[T]he prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."). Only "once we find that a party has standing," do we "turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence." *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226–27 (Fed. Cir. 2019).

While the government is correct that under WaveLink's first theory of prejudice, other offerors also could have improved their scores, that does not undermine WaveLink's standing to bring this case. The United States Court of Appeals for the Federal Circuit's decision in *Information Technology. & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003), is instructive on this point. In *Information Technology*, a post-award bid protest case, the agency intended to award one contract and received proposals from three offerors. 316 F.3d at 1315–16. Following award of the contract to the highest-rated offeror, the protester alleged that but for the agency's failure to conduct discussions with all offerors pursuant to FAR 15.206(d),[12] the protester would have been able to cure the deficiencies with its cost estimate and thus improve its position to receive an award. *Id.* at 1319. The Federal Circuit held that the protester had standing because had the agency engaged in discussions with the protester, "its proposal would have been improved and its chances of securing the contract increased if the problem with its cost estimate had been cured." *Id.* The Federal Circuit thus concluded that had the agency resolicited the contract, the protester would have a "*greater than an insubstantial chance* of securing the contract." *Id.* (emphasis added).

---

[12] As discussed *infra, see* Section IV.B., FAR 15.306(d) requires that when an agency conducts discussions with one offeror, discussions must be held with each of the offerors in the competitive range.

Accordingly, the Federal Circuit was unconcerned with the possibility that other offerors also would be able to revise and enhance their proposals due to discussions. This is because, in the words of the Federal Circuit, all that a protester must show is a "greater than an insubstantial chance of securing the contract." *Info. Tech.*, 316 F.3d at 1319. Here, WaveLink has done exactly that – it has sufficiently alleged that had it been able to revise its proposal by providing updated relevant experience information, WaveLink, at a minimum, would have had an increased chance of being awarded a contract. *See Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016) ("Notably, the substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors."); *see also Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 323–24 (2015) (rejecting the government's argument that protester lacked standing notwithstanding that if all offerors were reevaluated, other lower-priced offerors could have been rated more acceptable than the protester).

Furthermore, the Court finds that WaveLink has standing under its alternative theory of prejudice in Pool 3. The government relies on two decisions from this Court: *Octo Consulting Grp., Inc. v. United States*, 124 Fed. Cl. 462 (2015) ("*Octo Consulting I*"), and *Octo Consulting Grp., Inc. v. United States*, 2018 WL 2731416 (Fed. Cl. May 29, 2018) ("*Octo Consulting II*"), for the proposition that a protester lacks standing where a protester's "ranking nevertheless fell outside the contemplated number of awards" even after excluding noncompliant offers. Def. Reply at 6–7. The government's reliance on these cases misses the mark. Both of these cases involved procurements in which during the evaluation process, *all* of the offerors' technical scores were actually reviewed and validated before identifying the highest-scoring offerors. The resulting rankings, thus, were based on an actual evaluation of all offerors and were not subject to further re-sorting based on point deductions resulting from the agency's verification of self-scores. Put simply, in both *Octo Consulting* decisions, the rankings demonstrated with precision where the protester was ranked in relation to the contemplated number of awards and how many other offerors (not awarded a contract) had received a higher rank than the protester.

In *Octo Consulting I*, 124 Fed. Cl. 462, the agency first evaluated all 85 compliant quotes before determining the 20 lowest priced, exceptionally rated quotes and then awarded 16 contracts. *Id.* at 464–65. The protester was ranked twenty-third. *Id.* Thus, notwithstanding the agency's alleged error in awarding four of the contracts, the protester lacked a substantial chance of winning the contract due to the two offerors that were ahead. *Id.* at 468. Likewise, in *Octo Consulting II*, 2018 WL 2731416, the agency conducted a technical evaluation of all 170 offerors before selecting the highest-scored offerors for price evaluation and then awarded 60 contracts. *Id.* at *5. The

protester, ranked sixty-eight, alleged that the agency unlawfully awarded one of the contracts. *Id.* at *13. The case was dismissed because the protester was seven positions outside of the anticipated award zone and, given the rankings, the protester could not show prejudice. *Id.* In these cases, where the protester is definitively and demonstrably *not* "next in line for award" even assuming the validity of the protest grounds, it is unsurprising that a "direct economic interest" is lacking.

In contrast, the RFP at issue in this case expressly provided that only the highest-rated offerors in each Pool – based on the anticipated number of contract awards (*e.g.*, 160 offerors in Pool 3) – would have their self-scoring verified and validated by the Agency. AR 389. Due to the RFP's unique self-scoring feature, the Agency determined the 160 highest-scoring offerors for further review and verification based on the preliminary self-scores, most importantly *without* conducting a technical evaluation and verification of all the offerors' claimed points. In other words, all offerors with a self-score outside the first, validated top-160 offerors, including WaveLink, never had their scores verified and validated.[13] Again, that ranking was made purely on the basis of the *preliminary, but unverified,* self-scoring. Indeed, the government conceded during oral argument that the rankings for these offerors were not actually verified scores and could still be subject to re-sorting because of point deductions. *See* ECF No. 55 ("Supp. Oral Arg. Tr.") at 27–29. This is the critical distinction in the evaluation process of the RFP at issue, on the one hand, and the evaluation process addressed in the cases cited by the government, on the other.

To the extent that the government disputes WaveLink's characterization of certain other competitor offerors as having been removed from consideration, that is a merits question, not a standing one. That is because "before reaching the merits of the parties' dispute, the court conducts only a 'limited review' of the plaintiff[']s allegations and the administrative record for the 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.'" *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 530 n.12 (2010) (quoting *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005)). While the government may have an alternative (and valid) explanation for the "removal" label assigned to several of the offerors that the government maintains are ahead of WaveLink, "[a]t this point in the inquiry, we assume the well-pled allegations of error to be true." *Digitalis Educ. Sols., Inc. v. United States,* 97 Fed. Cl. 89, 94 (2011), *aff'd,* 664 F.3d 1380 (Fed. Cir. 2012). Regardless of

---

[13] While all offerors were initially screened, that was only to ensure that offerors submitted required supporting documentation, but not to evaluate whether such documentation was substantively accurate or supported the claimed points. AR 389.

WaveLink's merits case, the Court concludes that WaveLink has established standing sufficient to have its claims concerning both Pool 1 and Pool 3 decided on the merits.

## III.    Standards of Review

Judgment on the administrative record pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the record evidence. *Id.* at 1356–57.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). Pursuant to the Administrative Procedure Act ("APA") standard, the Court asks, "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)). In other words, the Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).

"When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal quotation marks omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001). To establish prejudice in a post-award challenge, a protester must further demonstrate that "'but for the alleged error, there was a substantial chance that it would receive an award–that it was within the zone of active consideration.'" *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (brackets omitted) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)). Simply put, "a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996); *see Navarro Rsch. & Eng'g, Inc. v. United States*, 151 Fed. Cl. 184, 192 (2020) ("The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors.").

## IV. Discussion

### A. GSA Properly Precluded WaveLink From Updating Its Proposal During The Evaluation Period

WaveLink, in Counts I and II of its amended complaint, contends that GSA acted in an arbitrary and capricious manner by "allow[ing] 10 months to lapse after obtaining proposals from offerors" without seeking updated proposals. Am. Compl. at ¶¶ 33–47; Pl. MJAR at 14. In that regard, WaveLink asserts that GSA "never even considered whether to update the 10-month old information that represented over 80% of the evaluation criteria" and instead "proceed[ed] with a source selection decision without requesting updated information on relevant experience and past performance." *Id.* at 16, 21. WaveLink, thus, concludes that GSA fails the APA standard of review because the Agency "'failed to consider an important aspect of the problem.'" *Id.* at 15 (quoting *Charles F. Day & Assoc., LLC v. United States*, 120 Fed. Cl. 767, 770 (2015)). WaveLink also contends that GSA violated applicable procurement law by not awarding contracts with "reasonable promptness"[14] and not considering an offeror's most "current and relevant" information. Pl. MAJR at 17.

As a threshold matter, the government asserts that WaveLink waived this claim by not protesting in a timely manner pursuant to *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).[15] Def. MJAR at 21–25; Def. Reply at 9. In *Blue & Gold*, the Federal Circuit held that a protester that "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."[16] 492 F.3d at 1313. In the government's

---

[14] WaveLink quotes this language from 10 U.S.C. § 2305(b)(4)(C). That statute, however, only governs Department of Defense contracts. To the extent that this language is relevant, WaveLink likely should have cited 41 U.S.C. § 3703(c), which similarly provides that an "executive agency shall award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the Federal Government."

[15] The government raises its *Blue & Gold* waiver argument as a basis for granting the government's motion for judgment on the administrative record pursuant to RCFC 52.1. *See* Def. MJAR at 21 ("If the Court does not dismiss the amended complaint, it should enter judgment on the administrative record in favor of the United States because the administrative record demonstrates that WaveLink has waived its challenge to the solicitation terms . . . ."). The *Blue & Gold* waiver rule, however, is better understood as grounds for *dismissal* of a plaintiff's complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. *See SEKRI, Inc. v. United States*, 152 Fed. Cl. 742, 752–53 (2021).

[16] This doctrine "was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications,

view, because WaveLink challenges a Solicitation term providing that relevant experience project submissions must have a one-year period of performance before the due date for proposals, WaveLink forfeited any right to relief by not protesting before final proposals were due.  Def. MJAR at 21–25; Def. Reply at 9.

The Court disagrees with the government's characterization of WaveLink's challenge.  While the government is correct, of course, that the *Blue & Gold* waiver rule precludes WaveLink from challenging a Solicitation term, WaveLink may protest errors in the proposal evaluation process.  "[A]s a general matter, a bidder cannot be expected to challenge an agency's evaluation of bids, in contrast to the terms of the solicitation, until the evaluation occurs."  *Bannum, Inc. v. United States*, 779 F.3d 1376, 1381 (Fed. Cir. 2015).  Moreover, as recently affirmed by the Federal Circuit, the *Blue & Gold* waiver rule only applies in situations where a plaintiff "exercising reasonable and customary care would have been on notice of the now-alleged defect in the solicitation long before awards were made."  *Inserso Corp. v. United States*, 961 F.3d 1343, 1352 (Fed. Cir. 2020); *see Phoenix Mgmt., Inc. v. United States*, 125 Fed. Cl. 170, 182 (2016) ("the purpose of the waiver rule was to prevent an offeror with *knowledge of a solicitation defect from sitting on that knowledge* until after the procuring agency awarded the contract" (emphasis added)).  In that regard, WaveLink does not contend that the one-year period of performance term is invalid or arbitrary or irrational; rather, WaveLink argues only that GSA's lengthy 10-month evaluation process rendered the originally submitted past performance and relevant experience volumes "stale and outdated by the time of the April 2020 source selection decision."  Pl. MJAR at 1.  In other words, WaveLink is not asserting that the Agency may not provide parameters for the experience references, but only that the length of the evaluation process ultimately rendered those parameters arbitrary and capricious.  WaveLink did not have notice prior to the award announcements in April 2020 that GSA would take 10 months to evaluate and award the contracts.  *See RMGS, Inc. v. United States*, 140 Fed. Cl. 728, 742 (2018) (rejecting application of waiver rule to the plaintiff's "unreasonable delay" in awarding the contract argument because the duration of the agency's evaluation process was "a fact which [the plaintiff] could not have known precisely until after awards were announced").  Accordingly, WaveLink's claim is timely pursuant to *Blue & Gold*.

### 1.  The Agency Did Not Act In An Arbitrary And Capricious Manner

Turning to the merits of WaveLink's initial argument that "an award may become irrational if an agency allows a significant amount of time to pass between its

---

and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact."  *Blue & Gold*, 492 F.3d at 1313–14 (citation omitted).

collection of information and its source selection decision[,]" Pl. MAJR at 17–18, this Court is mindful that the APA rational basis standard of review is "highly deferential" and that "the court should not substitute its judgment for that of the agency." *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 479 (2013). "Contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa Construzioni*, 238 F.3d at 1332). Indeed, "[t]his court will interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods.*, 63 Fed. Cl. at 223 (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

Here, GSA determined that on-ramping hundreds of additional small businesses contractors into Pools 1, 3, and 4 of the OASIS SB was consistent with "the Government's best interest that there remain an adequate number of Contractors eligible to compete for task orders in each OASIS SB Contract to meet the Government's professional service mission requirements." AR 332. GSA acted within its discretion to consolidate the on-ramping for all three Pools into one RFP for purposes of evaluating the numerous proposals, as offerors were permitted to submit the same proposal for all three Pools provided that the offerors met the relevant small business size standard. AR 6996. As a result, GSA had to evaluate 1,072 proposals across the three Pools. AR 6999. GSA sufficiently documented its reasoning for prioritizing the evaluation of proposals for, and the award of contracts within, Pool 1. AR 2397-98. Indeed, as part of this on-ramp process, GSA sent hundreds of clarification letters to offerors across all three Pools, eliciting hundreds of responses (totaling thousands of pages), which then needed to be reviewed and evaluated. *See, e.g.*, AR 2583, 2750, 2873, 6959-60. Given the sizable scale of this procurement, the Court finds it hardly surprising that GSA took 10 months to screen, evaluate, seek clarifications, reevaluate, and, ultimately, award hundreds of contracts across the three Pools. GAO protests and GSA's subsequent corrective action further contributed to the legitimate delay of this procurement. AR 9115–18, 9168–72, 9346–50, 9510–13, 9673–76. Under these facts, the Court finds that the Agency reasonably took 10 months from accepting proposals until its final award decisions with respect to all of the contracts across the three Pools.

Consistent with this understanding, the Court finds that WaveLink's argument that GSA "failed to consider an important aspect of the problem," Pl. MJAR at 15, is entirely without merit. WaveLink presumes a problem and then proposes an analysis that, in WaveLink's view, GSA should have undertaken but did not. *See id.* at 16 ("However, nothing in the Administrative Record indicates that GSA ever performed such an analysis."). Because GSA conducted the evaluation of the proposals in a reasonable manner, and in a reasonable time period, GSA was not required to analyze

whether offerors' relevant experience and past performance information had become "stale" during the 10-month evaluation process. Indeed, WaveLink provides no limiting principle as to when information that was current at the time of submission may become stale during proposal evaluations. If an agency were always required to obtain "updated" information, the evaluation stage of a complex procurement would never end. There is nothing irrational about an agency not reopening the proposal process simply for an offeror to provide new information that was not available at the time of initial proposal submissions. That reopening the proposal process might have worked to WaveLink's advantage, does not mean the Agency was required to do so.[17]

### 2. The Agency Was Not Required By Law To Obtain Updated Proposals

WaveLink directs the Court to various statutory and regulatory authorities that, in WaveLink's view, should require evaluation of only the most current and relevant proposal information at any given time. *Id.* at 16–20 (citing 41 U.S.C. § 1126 and FAR 15.305(a)(2)(i)). Finally, WaveLink argues that pursuant to FAR 15.306(a)(2), "GSA had the authority to obtain updated past performance information without opening discussions." Pl. MJAR at 22. The Court is unpersuaded.

Section 1126 of Title 41 of the United States Code articulates the federal government's policy that agencies should ensure that "offerors are afforded an opportunity to submit relevant information on past contract performance[.]" Similarly, FAR 15.305(a)(2)(i) provides that because "[p]ast performance is one indicator of an offeror's ability to perform the contract successfully[, t]he currency and relevance of the information . . . shall be considered." To the extent that either of these authorities require an agency to constantly inquire from an offeror whether the submitted information is the most current and relevant – and they most certainly do not – these authorities concern "past performance," not the "relevant experience" volume about which WaveLink primarily complains.

---

[17] The lone authority that WaveLink cites for this proposition, *New Hampshire-Vermont Health Services*, B-189603, 78-1 CPD ¶ 202, 1978 WL 13386 (Mar. 15, 1978), is a decades-old GAO decision that involved a procurement in which the relevant agency *required* offerors to submit past performance ratings that were seven months old. *Id.* at *7–*9. GAO held that such evaluations "should be based on the most current information available." *Id.* at *8. That decision, however, involved the validity of information at the time of proposal submission and thus the offeror never had an opportunity for the agency to consider the offeror's most recent, relevant information. Here, WaveLink was afforded such an opportunity at the time of proposal submission but now wants a perpetual update process. This GAO decision does not support such an argument.

As the government correctly points out, *see* Def. Reply at 10, WaveLink claimed the maximum 4,000 points for past performance. Obviously, WaveLink could not have been prejudiced by not being permitted to update its past performance volume. Rather, WaveLink could be prejudiced, if anywhere, only by the Agency's not asking for, and considering, updated relevant experience information. *See* ECF No. 1-1. In particular, WaveLink sought to provide updated *relevant experience* information that (allegedly) would have increased its score from [**] points to [**] points. *Id.* While WaveLink contends that past performance and relevant experience are "two sides to the same coin," ECF No. 42 ("Oral Arg. Tr.") at 56, WaveLink is mistaken to the point that its argument borders on frivolous. As the RFP makes perfectly clear, offerors submitted distinct volumes addressing these two factors and they were separately evaluated and scored. AR 370, 381. This is because "[e]xperience is the amount of relevant experience an offeror has[,]" while "[p]ast performance is how well an offeror performed." Ralph C. Nash & John Cibinic, *Postscript III: Experience Requirements in Best Value Procurements*, 16 No. 4 Nash & Cibinic Rep. ¶ 17 (2002). Because the statute and regulation upon which WaveLink relies relate only to *past performance*, GSA could not have violated those provisions simply by declining to permit an updated *relevant experience* volume.

For the same reason, GSA could not have obtained this information from WaveLink without opening discussions pursuant to FAR 15.306(a)(2). This provision of the FAR permits an agency to seek clarification of "the relevance of an offeror's *past performance* information and adverse *past performance* information to which the offeror has not previously had an opportunity to respond[.]" FAR 15.306 (a)(2) (emphasis added). Again, past performance is not the same thing as relevant experience in the context of this RFP. On the contrary, as discussed *infra*, *see* Section IV.B., had the Agency engaged in communications with WaveLink seeking updated relevant experience information, that would have constituted discussions, something the Agency assiduously avoided.

### B.    GSA Did Not Conduct Discussions With Other Offerors

Clarifications are "limited exchanges" in which "offerors may be given the opportunity to clarify certain aspects of proposals . . . or to resolve minor or clerical errors." FAR 15.306(a)(1), (2). "Clarifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018) (citation omitted). Importantly, as the permissive ("may be given the opportunity") language of FAR 15.306(a)(2) indicates, "the Government is permitted—but not required" to engage in clarifications. *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1346 (Fed. Cir. 2021). An agency will be found to have abused its discretion in not seeking clarifications only when "it should have discerned

that the protestor made an error rather than a deliberate decision." *Telesis Corp. v. United States*, 140 Fed. Cl. 765, 771–72 (2018).

FAR 15.306(d) also authorizes agencies to conduct "discussions" with offerors once the competitive range is determined. Discussions "are intended to maximize the Government's ability to obtain the 'best value' in a procurement." *Afghan Amer. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 361 (2009). "If the agency decides to award the contract after holding discussions, it must hold discussions with all responsible offerors within the competitive range." *Info. Tech.*, 316 F.3d at 1312 (internal quotation marks omitted). Once discussions have occurred, "each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision" – referred to as a "FPR." FAR 15.307(b); *see Omniplex World Servs. Corp. v. United States*, 105 Fed. Cl. 706, 715–20 (2012). Accordingly, "[t]he acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for quotations or proposals to be revised or modified." *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 626 (2005) (citation omitted).

WaveLink, in Count III of its amended complaint, contends that GSA conducted discussions with various offerors in Pool 1 and Pool 3 by permitting them to revise different parts of their proposals to address deficiencies or to make corrections. Am. Compl. at ¶¶ 48–80; Pl. MJAR at 23–26. WaveLink argues that it likewise should have been afforded the opportunity to revise its proposal – namely, to update its relevant experience and past performance volumes.[18] *Id.* at 26. The government primarily counters that all of these communications merely amounted to clarifications, not discussions.[19] Def. MJAR at 30–34. These communications can be grouped into three categories, none of which constitute discussions with other offerors.

---

[18] As noted *supra*, *see* Section IV.A, because WaveLink received the maximum allowable points for past performance, it could not have been prejudiced when GSA did not ask for or permit WaveLink to submit an updated past performance volume.

[19] The government additionally argues that even assuming the Agency conducted discussions, WaveLink still would not be entitled to submit a fully revised proposal because allowing updated relevant experience that did not comply with the one year of performance requirement "would have contravened the terms of the solicitation." Def. MJAR at 34. The government also contends that only offerors within the "competitive range" are entitled to submit a fully revised proposal, and, here, the Agency effectively made a competitive range decision based on its determination to evaluate only the highest-ranked offerors given the anticipated number of awards in each Pool. Def. Supp. Br. at 4–7. Neither of these arguments is persuasive. The RFP did not specify from when the one year of performance would be calculated. *See* AR 370. While GSA clarified in the Q&As that "[t]he 1 year period of performance would be from the date of solicitation closing," AR 697, this reasonably could be understood to only require one year of performance by the time final proposals are submitted. Thus, to the extent that GSA conducted

*First*, an agency may seek clarifications from offerors for the purpose of "eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal." *Info. Tech.*, 316 F.3d at 1321. Moreover, clarifications are appropriate "when 'the existence of the mistake and the amount intended by the offeror is clear from the face of the proposal.'" *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 508 (2019) (quoting *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 545 (2007)). Here, the Agency permitted six offerors to correct direct labor rates that were higher than the RFP's labor rate range – five offerors in Pool 1 and one in Pool 3 – and, additionally, one offeror in Pool 1 that entirely omitted a labor rate. All of these communications, however, merely amounted to correcting mistakes that were either clearly clerical or relatively minor errors or where the information was readily present elsewhere in the proposal.

For example, [**] erroneously provided one labor rate at $[**] instead of $[**], which was the correct rate identified in a different spreadsheet tab delineating the same or similar data. AR 6903. [**] provided a direct labor rate of $[**] where the intended rate was $[**] – a clear transposition error. *Id.* Based on the pattern of pricing in [**]'s offer, it was readily apparent that the one rate which deviated from that pattern was a clerical error. AR 6914. [**]'s offer, similarly, contained a single rate which deviated from the pattern of all the other rates in its proposal. AR 6928. [**] erroneously rounded one of its rates, causing it to be $0.01 over the RFP's specified range. AR 6930. [**]'s proposal included one rate of $[**], where the intended rate should have been $[**] – a difference of one digit. AR 7109–10. Finally, [**] omitted one rate on a spreadsheet tab, but another tab contained the applicable rate and its supporting documents "demonstrat[ed] that they intended to provide the exact same direct labor rates on both

discussions triggering the rule that all offerors could submit a FPR, it would not contravene the RFP's terms for WaveLink to include projects that were completed after the June 28, 2019 due date for initial proposals, but before any FPR (so long as such projects spanned a year). Regarding the government's "competitive range" argument, the Court firmly rejects the notion that an agency can create a competitive range before an agency even contemplates conducting discussions. In that regard, FAR 15.306(c) expressly provides that "[a]gencies shall evaluate all proposals in accordance with 15.305(a), and, *if discussions are to be conducted*, establish the competitive range" (emphasis added). Here, offerors were ranked based on their preliminary score only for determining which proposals to evaluate, and the RFP specified that GSA "intends to award contracts without discussions" unless determined to be necessary. AR 388–89. As GSA did not contemplate conducting discussions, and denies having engaged in discussions, the preliminary rankings cannot themselves constitute a competitive range. To the extent that GSA may have *later* conducted discussions with specific offerors, GSA cannot retroactively rely on its determination to only evaluate the highest-ranked offerors (based on the anticipated amount of awards in each respective Pool) to be construed as a competitive range determination.

. . . tabs of their Volume 6 [pricing] template." AR 6904. In sum, none of these communications constituted discussions.

*Second*, this Court has "approvingly cited GAO cases" holding that "exchanges concerning an element of responsibility . . . do not constitute discussions." *DynCorp Int'l*, 76 Fed. Cl. at 546–47; *see Octo Consulting II*, 2018 WL 2731416, at *12 ("[C]ommunications based on a responsibility determination in accordance with the FAR, does not open up discussions for other areas to include those related to responsiveness.").[20] The RFP instructed offerors to submit financial statements for the responsibility volume, not as part of the cost/price volume. Because the financial information that GSA sought from five offerors in Pool 1, *see* AR 6907, 6914, 6919–20, 6926, 6928, "relates to offeror responsibility, rather than proposal evaluation, [the exchanges do] not constitute discussions and thus [do] not trigger the requirement to hold discussions with the other competitive range offerors." *Gen. Dynamics-Ordinance & Tactical Sys.*, B-295987, 2005 CPD ¶ 11, 2005 WL 1468418, *9 (May 20, 2005); *see Lawson Enviro. Servs., LLC v. United States*, 126 Fed. Cl. 233, 247 (2016) (holding that "an offeror may present evidence subsequent to proposal submission but prior to award to demonstrate the bidder's responsibility" without triggering discussions); *Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 419–24 (2013) ("The Agency engaged in a responsibility evaluation, not discussions.").

*Third*, a single offeror in Pool 1, Spinvi Consulting, LLC ("Spinvi"), omitted its CMMI certificate documentation from its proposal. Pursuant to the RFP, however, offerors were not required to submit a CMMI certificate to claim and ultimately receive points. AR 398–99. On April 2, 2020, GSA sent a clarification letter to Spinvi that provided, in part, as follows:

> The purpose of this letter is to request clarification pursuant to FAR Part 15.306(a)(1) regarding your firm's proposal submission in response to the subject Solicitation. In conducting our initial review of your proposal, we found the following discrepancies between your proposal documentation and the Solicitation requirements:
>
> • Solicitation L.5.5.5 describes the requirements for claiming credit for a L.5.5.5. CMMI Maturity Level 2 Certification (or higher).

---

[20] "Though GAO opinions are not binding on this court, . . . this court may draw on GAO's opinions for its application of this expertise." *Allied Tech. Grp.*, 649 F.3d at 1331 n.1.

      o   The Government is unable to locate any supporting documentation in your proposal to support the points claimed for CMMI Level 2.

AR 4872. Spinvi subsequently provided GSA with the CMMI supporting documents and was awarded a contract in Pool 1. AR 4871, 6840.

At first glance, this communication would appear to be a discussion, which would be problematic for the government given that GSA did not intend to open discussions with offerors and that having done so likely would have required GSA to accept FPRs from all offerors. In that regard, Spinvi's failure to provide its CMMI certification was not an obvious clerical error. Nor was the CMMI certification part of the responsibility volume of the proposal; rather, the CMMI certification was a scored portion (worth 100 points) of the systems, certifications, and clearances volume of the proposal. AR 399. Furthermore, although the CMMI certification was not a mandatory requirement and, thus, the lack of proposal documentation could not constitute a "material omission," *see MSC Indus. Direct Co. v. United States*, 140 Fed. Cl. 632, 646 (2018), clarifications are still improper when the information would "alter the technical or cost elements of the proposal." *Dell Fed. Sys.*, 906 F.3d at 998.

The Court need not definitively resolve this issue, however, because an express provision in the RFP controls and permitted the Agency's approach here. *See AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009) ("It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation."). The RFP provided that during the initial screening (*i.e.*, step one of the evaluation process outlined *supra*), all proposals would be reviewed to ensure that supporting documentation was submitted for each claimed point (without the Agency verifying the contents or substance of that document). AR 389. Proposals that omitted supporting documentation, if unrelated to a minimum submission requirement, "w[ould] be treated as *clarifications*." *Id.* (emphasis added). This language is clear and unambiguous.[21] Consistent with this RFP provision, GSA sought missing documents from Spinvi for claimed points not relating to a minimum requirement. This is clearly evident from the clarification letter that GSA sent to Spinvi, which indicated that "[t]he

_____

[21] The Court does not opine on the legality of an agency's treating the submission of missing documents that impact scoring as a clarification because WaveLink has not raised this argument. Even if WaveLink would have challenged this RFP provision as part of the instant case, however, the Court would be required, pursuant to the *Blue & Gold* waiver rule, discussed *supra* Section IV.A., to dismiss that challenge as untimely. The express terms of the RFP put all offerors, including WaveLink, on notice that GSA could request such missing documentation without conducting discussions.

Government is unable to locate any supporting documentation in your proposal to support the points claimed for CMMI Level 2." AR 4872. As the Agency followed the RFP's terms regarding the characterization of the communication, this exchange of information between GSA and Spinvi was not a discussion.

To be clear, the Court notes that this RFP "missing document" provision provided that discrepancies would be addressed with offerors as part of the *initial* screening process. AR 389. As is evident from the April 2, 2020 date on GSA's clarification letter to Spinvi, the CMMI certification request was issued only far later in the evaluation process. AR 4872. This is of no consequence, however, because the RFP did not expressly limit the time period in the evaluation process in which GSA may seek clarification of an offeror's lack of documentation. Although the RFP mentioned that these clarifications would take place as part of the initial screening period, there is no reason that such exchanges should be converted into discussions just because they take place later in the process. This interpretation of the RFP is reasonable as the timing of these requests is of no significance and WaveLink does not argue, or provide any support, to the contrary. Alternatively, even assuming that there was a mistake, "[*d*]*e minimis* errors in the procurement process do not justify relief." *Glenn Def. Marine (ASIA), PTE Ltd. V. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). "'De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can be safely ignored.'" *AECOM Mgmt. Servs., Inc. v. United States*, 147 Fed. Cl. 285, 293 (2020) (brackets omitted) (quoting *Anderson Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)). Accordingly, the Court does not find that GSA's communication with Spinvi constituted a discussion so as to trigger the requirement that GSA conduct discussions with all offerors, including WaveLink.

C. **GSA Violated The Solicitation And The FAR In Awarding Contracts To Offerors With Direct Labor Rates Below The RFP's Range (Without A Required Supporting Rationale) But WaveLink Only Demonstrates Prejudice In Pool 3, Not In Pool 1**

WaveLink, in Count IV of its amended complaint, alleges that "GSA violated a fundamental principle of government procurement by relaxing the [Solicitation] requirements in [sections] L.5.6.(h) and M.5.4.(f) for more than a dozen offerors." Am. Compl. at ¶ 87. WaveLink contends that GSA erred in failing to apply a mandatory Solicitation requirement, which resulted in unlawful contract awards to otherwise ineligible offerors, or, in the in alternative, in not issuing a solicitation amendment to delete the mandatory requirement. Pl. MJAR at 2. With regard to the latter contention, WaveLink argues that had the Agency issued an amendment, all offerors, including WaveLink, would have been able to submit a fully revised and updated proposal. *Id.*

For the reasons explained below, the Court agrees with WaveLink that the Agency violated the terms of the Solicitation and, in so doing, the FAR. The Court further concludes that such violations prejudiced WaveLink in Pool 3 but not in Pool 1.

### 1. In Awarding Contracts To Ineligible Offerors, GSA Violated The Solicitation, FAR 15.305(a) And FAR 15.206(d)

The RFP provided in sections L.5.6.(h) and M.5.4.(f), respectively, as follows:

> Offerors are strongly encouraged to propose a Direct Labor rate for each OASIS SB labor category within the ranges provided in Section J.2. **CAUTION:** Failure to provide clear and convincing rationale to support a lower or higher direct labor rate outside the ranges set forth in Section J.2., ***will result in a determination the rate(s) are not fair and reasonable and the Offeror would not be eligible for award regardless of their technical score***.
>
> . . . . .
>
> If an Offeror does not meet one or more of these parameters for any labor category, the Offeror is strongly advised to provide clear and convincing rationale to support the proposed direct/indirect and/or profit rate(s). ***In the event the rationale is not determined reasonable, the proposal will be deemed to have a ceiling rate(s) that is not considered fair and reasonable and the proposal would not be eligible for award, regardless of technical score.***

AR 387 (§ L.5.6.(h)), 399 (§ M.5.4.(f)) (emphases added).

In construing the provisions of a solicitation, this Court is guided by "well-settled principles of contract interpretation." *Linc Gov't Servs.*, 96 Fed. Cl. at 708. Critically, "[i]f the provisions are clear and unambiguous, the court must give them 'their plain and ordinary meaning.'" *ARxIUM, Inc. v. United States*, 136 Fed. Cl. 188, 198 (2018) (quoting *Banknote Corp.*, 365 F.3d at 1353); *see Linc Gov't Servs.*, 96 Fed. Cl. at 708 ("Unless it is manifest that another meaning was intended and understood by all the parties, the text of the solicitation must be accorded its plain and ordinary meaning."). Moreover, when a solicitation provision uses *mandatory* language that is clear and unambiguous, "[t]he dispositive issue is not whether [the offeror's] proposal was reasonable, but whether it complied with the mandatory requirements of the solicitation." *Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 139 (1999) ("The

solicitation's use of terms such as 'shall' and 'must,' as opposed to, for example, 'should' or 'may,' reinforces plaintiff's interpretation that a compliant proposal required four distinct labor categories, each performing the number of hours set forth in the solicitation.").

In *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650 (2020), this Court laid out the regulatory framework for how an agency must approach mandatory solicitation provisions, explaining as follows:

> FAR 15.305(a) provides that "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." FAR 15.206(d) further provides that "[i]f a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection." Taken together, these FAR provisions enunciate the principle that an agency cannot award a contract to an offeror "that did not meet the mandatory requirements of the solicitation." 15 No. 8 Nash & Cibinic Rep. ¶ 40. The Federal Circuit likewise has explained that "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996); see also *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Indeed, an agency contracting officer has three choices when a proposal does not meet a solicitation's mandatory requirements: "(1) amend the solicitation in accordance with FAR 15.206(d), (2) negotiate with the offeror to get it to meet the requirements, or (3) reject the proposal." 15 No. 8 Nash & Cibinic Rep. ¶ 40.

*DigiFlight*, 150 Fed. Cl. at 657.

As WaveLink correctly notes, the Solicitation's plain, unambiguous language specifies that an offeror "would not be eligible for award" if it fails to provide a "convincing rationale to support" a direct labor rate outside of a set range. Pl. MJAR at 5 (quoting AR 387). The above-quoted direct labor provisions were mandatory

Solicitation provisions that the Agency was not free to ignore. Thus, in awarding contracts to offerors with non-compliant direct labor rates – *i.e.*, that were outside the specified range and without a required, supporting rationale – the Agency did not comply with these mandatory Solicitation provisions. The Court knows this to be the case *because the government previously reached that very same conclusion regarding virtually identical language in the same Solicitation at issue here*. *See DigiFlight*, 150 Fed. Cl. at 650. In *DigiFlight*, the government moved to dismiss DigiFlight's complaint where it admittedly had failed to submit a profit rationale, which the government characterized as a material solicitation requirement. *Id.* at 656-57. The Solicitation language at issue in *DigiFlight* provided: "CAUTION: Failure to provide clear and convincing rationale to support a profit rate that exceeds 7% will result in a determination that Profit is not fair and reasonable[,] and the Offeror would not be eligible for award regardless of their technical score." *Id.* at 658. Thus, the only difference between the Solicitation language at issue in the instant case and the language addressed in *DigiFlight* is that the former concerns direct labor rates outside of a set range, and the latter concerns profit rates outside of a set range.

### i. The Government's Interpretation Of The Solicitation Is Erroneous As A Matter Of Law

Applying those basic principles outlined in *DigiFlight* to this case leads to the ineluctable conclusion that the Agency violated a mandatory term of the Solicitation and, thus, improperly awarded contracts to perhaps as many as 30 offerors (spanning Pools 1 and 3) that submitted non-compliant proposals. Contrary to both the government's position and the Court's conclusion in *DigiFlight,* the Agency: (1) never amended the Solicitation pursuant to FAR 15.206(d) to remove the mandatory language in sections L.5.6.(h) and M.5.4.(f); (2) did not engage in discussions (*i.e.*, negotiations) with non-compliant offerors to bring their proposals into compliance with sections L.5.6.(h) and M.5.4.(f); and (3) did not reject proposals that failed to comply with sections L.5.6.(h) and M.5.4.(f). Accordingly, the Agency violated the terms of the Solicitation and, in turn, FAR 15.305.[22]

The government argues that "GSA did not relax the requirements with respect to direct labor rates that were below those provided in Section J.2 because GSA's actions did not constitute a material change to the terms of the solicitation[.]" Def. Reply at 16. Put differently, the government maintains that "GSA did not change the solicitation

---

[22] Moreover, as demonstrated *infra*, the Agency's approach to offerors that failed to comply with sections L.5.6.(h) and M.5.4.(f) at issue here is precisely the opposite of how the Agency treated the plaintiff in *DigiFlight*.

requirement" but rather simply "interpreted the solicitation language to prohibit the agency from deeming a proposal unreasonable due to too low prices."  Def. MJAR at 37.  The government thus contends that "rather than changing the solicitation requirements or evaluation requirements, GSA applied the solicitation requirements consistent with relevant legal principles."  *Id.*

The Court rejects the government's attempt to avoid the Solicitation's plain language by asserting that the Agency merely decided to read it differently.  The Solicitation provides, in mandatory terms – following an all-caps "CAUTION" warning – that the "[f]ailure to provide clear and convincing rationale to support a lower or higher direct labor rate outside the ranges set forth in Section J.2., ***will result*** in a determination the rate(s) are not fair and reasonable and the Offeror would not be eligible for award regardless of their technical score."  AR 387 (emphasis added).  The Agency could have amended the Solicitation to remove or revise that mandatory language.  *See Beta Analytics Int'l*, 44 Fed. Cl. at 139.  Not having done so, however, the Agency was bound to follow the Solicitation's terms as written, not how the Agency wishes it had written them.  *Alfa Laval*, 175 F.3d at 1367–68 (holding that, in waving a mandatory solicitation provision for an offeror, "the Navy violated a clearly applicable procurement statute and regulation").  Applying *Alfa Laval*, this Court has specifically held that the government cannot simply reread clear, mandatory language to mean something different than what it says:

> The appeals court explained that procuring officials' views regarding the appropriateness of standards set forth in the solicitation cannot relieve the agency from mandatory terms of a solicitation. . . . Thus, if a protestor can demonstrate an instance in which a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail, provided it can demonstrate that, but for the violation, it had a substantial chance to receive the award.

*Beta Analytics Int'l*, 44 Fed. Cl. at 138.[23]

Several defendant-intervenors contend that "fair and reasonable" is a term of art based on FAR principles that "'generally addresses whether a price is *too high*.'"  ISYS Br. at 4–5 (quoting *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004) (emphasis added)); *see also* Kalman Br. at 2–4, NetCentric Br. at 2–4, RED Br. at 2.  In contrast, only

---

[23] *Cf. SBSI, Inc.*, B-410923, 2015 CPD ¶ 112, 2015 WL 1406102 (Mar. 20, 2015) ("Where an offeror fails to submit information required by the RFP, we cannot find that the agency acted unlawfully when it refused to further consider that offeror for award.").

where a solicitation incorporates a cost realism analysis is an agency "'investigat[ing] whether the contractor is proposing a price so low that performance of the contract will be threatened.'" Kalman Br. at 2 (quoting *EMTA Isaat, A.S. v. United States*, 123 Fed. Cl. 330, 338 n.9 (2015)). Because the Solicitation only mentions "reasonableness," defendant-intervenors' view is that "the government is obviously referring to the . . . . accepted legal definition of price reasonableness[.]" Kalman Br. at 3–4. Put differently, defendant-intervenors argue that "fair and reasonable" must mean "too high." *E.g.*, RED Br. at 3.

While defendant-intervenors appear to be generally correct regarding the meaning of the phrase "fair and reasonable," their approach to the phrase in the Solicitation fails to account for the preceding verbiage – "failure to provide clear and convincing rationale to support *a lower* or higher direct labor rate *outside the ranges*[.]" AR 387 (emphasis added). When interpreting a solicitation, the Court must harmonize provisions where possible, not create a conflict. *Safeguard Base Operations*, 989 F.3d at 1344 ("We must consider the Solicitation as a whole and interpret it in a manner that harmonizes and gives reasonable meaning to all of its provisions." (internal quotation marks omitted)). Rather than reason from the premise that "fair and reasonable" must refer exclusively to prices that are too high, the better approach is understanding that the Agency has *operationally defined this term for purposes of this procurement* to refer to any price that is acceptably within the RFP's range or, if outside the range, has an accompanying acceptable rationale. This approach gives meaning to "fair and reasonable" without deleting the words "lower" and "outside the ranges" from the Solicitation.[24] At least one defendant-intervenor admitted during oral argument that

---

[24] This is not the only place in this Solicitation where particular terms of art do not have their ordinary meaning. For example, the RFP purported to be a FAR Part 15 "best value" negotiated procurement with contracts awarded to the "Highest Technically Rated Offerors with a Fair and Reasonable Price." AR 388. Based on accepted statutory and FAR principles, the term "best value" in negotiated acquisitions has a defined meaning – requiring a balancing between technical considerations and price. FAR 15.101; *see* FAR 15.304 ("Price or cost to the Government shall be evaluated in every source selection . . . .); *see also Serco v. United States*, 81 Fed. Cl. 463, 491–501 (2008) ("[A]n evaluation that fails to give price its due consideration is inconsistent with CICA and cannot serve as a reasonable basis for an award."). The RFP, however, provided that only the technical components would be scored, whereas cost/price was assessed only for reasonableness. AR 389, 400–01. Although offerors submitted widely divergent prices, GSA did not conduct a balancing analysis of the technical factors and price. Nevertheless, GSA referred to the OASIS SB as a "best value" procurement, using that term in a manner clearly in tension with its accepted meaning. *See* Ralph C. Nash & John Cibinic, *"Highest Technically Rated Offerors With Fair And Reasonable Pricing": A New Source Selection Technique*, 30 Nash & Cibinic Rep. ¶ 23 (2006) (questioning whether OASIS SB's "best value" technique is legal). To the extent that this Court has held that the OASIS SB's best value methodology comports with the requirement to consider price in a best value procurement, *see*

their approach would effectively read language out of the Solicitation. *See* ECF No. 111 ("Status Conf. Tr.") at 20.

Alternatively, defendant-intervenor RED argues that while § L.5.6.(h) of the Solicitation mandates a "convincing rationale to support *a lower* or higher direct labor rate *outside* the ranges[,]" AR 387 (emphasis added), § M.5.4.(f) provides only that if "the rationale is not determined reasonable, the proposal will be deemed to have a *ceiling* rate(s) that is not considered fair and reasonable" AR 399 (emphasis added). RED Br. at 2–3. RED contends that this alleged contradiction regarding whether offerors that failed to provide a rationale for direct labor rates below the RFP's ranges would be excluded constitutes a patent ambiguity in the Solicitation, and because no offeror protested, the Agency has the discretion to interpret this ambiguity in any reasonable manner. *Id.* at 3–4. Even assuming that an Agency may select any reasonable interpretation of patently ambiguous solicitation language, federal agencies are required to engage in reasoned decision-making, generally, and when taking corrective action, in particular. *See Raytheon Co. v. United States*, 121 Fed. Cl. 135, 150–51 (2015). Here, as discussed at length below, *see infra* Section IV.C.1.iii, the Agency originally read the Solicitation to give meaning to all of its words and phrases, such that offerors that proposed labor rates below the specified range without providing a rationale would be found ineligible. Then, in the face of a GAO protest, the Agency switched its position without any explanation for the new approach (and merely concluded that the Agency would now accept the previously ineligible offerors). The Agency's about-face was not undertaken to address a GAO decision or a clearly meritorious protest. Indeed, the Agency did not explain why corrective action was warranted, nor did the Agency explain how its newly-decided reading of the Solicitation implemented § L.5.6.(h)'s directive, requiring a rationale for a "*lower . . .* direct labor rate *outside the ranges*[.]" AR 387 (emphasis added). Rather, the Agency all but read those critical words out of the Solicitation. Thus, the Agency's voluntary corrective action failed to account for the very language in the Solicitation on which the Agency previously had relied to exclude offerors and, as result, is not reasonable but arbitrary and capricious.

The Court's holding on this issue is not novel. The point is simply that, generally, agency action (*i.e.*, including an agency decision relating to a procurement) must be reasonable and is not insulated from review merely because an agency cloaks it in corrective action clothes. That said, this result serves as a cautionary tale for agencies

---

*Octo Consulting Grp. v. United States*, 117 Fed. Cl. 334 (2014), this Court is not bound by that decision. At the June 16, 2021 status conference, no defendant-intervenor attempted to explain how the agency's use of the term "best value" may be reconciled with the agency's failure to balance the technical scores against price/cost.

implementing corrective action that, while furthering a short-term goal of resolving a GAO protest, may merely kick the can down the road by creating yet new (but foreseeable) problems.[25]

Defendant-intervenor RED, putting a different twist on its argument, further contends that because the Solicitation language at issue created a patent ambiguity, WaveLink's *post*-award bid protest is an untimely challenge to the Solicitation pursuant to *Blue & Gold*, 492 F.3d 1308. RED Br. at 4–5. The Court is not persuaded for the simple reason that WaveLink submitted direct labor rates *that were within the RFP's ranges* and, accordingly, had no reason to file a pre-award bid protest. Moreover, WaveLink had no reason to believe that offerors would submit rates below the RFP's range and that the Agency would accept those proposals. *See Inserso*, 961 F.3d at 1352 (holding that *Blue & Gold* applies only to a solicitation defect that an offeror "exercising reasonable and customary care" would have noticed). The Court is unaware of, nor does RED provide, any case law from this Court (or the GAO) to support the assertion that WaveLink should have filed a pre-award protest to preclude the Agency from accepting offerors that submitted proposals with direct labor rates below the specifies ranges without the required, corresponding rationale. Indeed, at the June 17, 2021 status conference, counsel for RED conceded that "[g]ranted, it would not be a run-of-the-mill protest for somebody to come in and say, we want to confirm that [the agency is] going to kick all those other people out." Status Conf. Tr. at 14.

### ii. The Government Is Judicially Estopped From Offering An Alternative Reading Of The Mandatory Solicitation Provision

As this Court previously has noted, "[t]he doctrine of judicial estoppel is

---

[25] Unfortunately, GAO did not help the matter by issuing a perfunctory protest dismissal in the absence of any explanation from GSA as to how it would implement corrective action. The Court is sympathetic to the premise that a GAO protest does not deprive an agency of jurisdiction to take action in a procurement, nor is the GAO a federal court that must apply Article III mootness rules before dismissing a protest. Nevertheless, it remains clear to the Court that GAO should not have approved (implicitly or explicitly) corrective action in this case where it had the effect of reading language out of the solicitation, but without explanation as to why that was necessary or at all warranted. *Cf. Owens & Minor Distrib., Inc. v. United States*, 2021 WL 2549413, *3–*5 (Fed. Cl. June 22, 2021). Moreover, had the GAO required the GSA to explain *how* it would implement the intended corrective action, the instant, follow-on protest may well have been avoided, as defendant-intervenor GaN correctly explained. *See* GaN Br. at 5 ("Had the Agency amended the Solicitation to be facially consistent with its commitment to GAO, this protest never would have landed on the Court's desk. But it did not, and the Court concluded that it violated applicable law by evaluating [proposals] contrary to the Solicitation's terms." (internal footnote omitted)).

intended to prevent a litigant from 'playing fast and loose with the courts' by assuming contrary positions in legal proceedings[.]"  *City of Wilmington v. United States*, 152 Fed. Cl. 373, 378–79 (2021) (quoting *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 127 (2011), and citing *Housing Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 643 (2020)).  Thus, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the [other] party[.]"  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  The Supreme Court has identified a series of factors to consider when applying the doctrine of judicial estoppel: (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) the party must have succeeded in persuading a court to adopt the earlier position, thereby posing a "risk of inconsistent court determinations"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Id.* at 750–51.  These factors are "non-exclusive" and "guide a court's decision whether to apply judicial estoppel[.]"  *Transclean Corp. v. Jiffy Lube Int'l, Inc.,* 474 F.3d 1298, 1307 (Fed. Cir. 2007).

The Court will not permit the government to take a different position – regarding nearly identical language in the same Solicitation – from what the government argued, and prevailed upon, in *DigiFlight*.  In that case, the government moved to dismiss a bid protest, arguing based upon nearly identical language from the identical Solicitation that the plaintiff's failure to provide a rationale for its profit rate (that was outside of a specified range) constituted a material omission fatal to its proposal.  150 Fed. Cl. at 656-57; *see also* Government's Motion for Judgment, *DigiFlight, Inc. v. United States*, Case No. 20-764, at *8 (July 24, 2020) (ECF No. 15) ("These warnings communicated that the profit rationale in section L.5.6.(j) was a clear material or go/no-go requirement, without which the contracting officer would reject the proposal.").  Indeed, the government specifically argued that "DigiFlight's failure to comply with those material requirements rendered it ineligible for award."  *DigiFlight*, ECF No. 15 at 9.  Although DigiFlight had argued the government's motion should be denied because the Court had to examine the administrative record to decide whether or not the Solicitation language at issue constituted a material requirement, the government, in its reply brief, characterized DigiFlight's argument as "seemingly designed to avoid addressing the solicitation's *plain language*."  *DigiFlight*, ECF No. 18 at 4-5 (emphasis added) (explaining that "DigiFlight admittedly violated [the solicitation] by failing to include the profit rationale in its proposal, resulting in GSA removing DigiFlight from the competition *exactly as stated in the solicitation*" (emphasis added)).  Lest there be any ambiguity about the government's position in that case, the government clearly argued for the precise result it now argues against:  "it is hard to imagine what constitutes a 'material requirement' more than a clear warning that failure to provide a proposal item needed

to evaluate profit would automatically result in ineligibility for award."  *Id.* at 5 (government arguing that "solicitation section L.5.6.(j) constituted a go/no-go requirement, without which the contracting officer would reject the proposal").

To the extent DigiFlight argued for a different reading of the plain language – in favor of one that, in its view, was consistent with the FAR – the government responded, and the Court agreed,[26] that DigiFlight's argument was untimely pursuant to the *Blue & Gold* waiver rule.  *See* Government's Reply Brief, *DigiFlight, Inc. v. United States*, Case No. 20-764, at *6 (Aug. 27, 2020) (ECF No. 18) (citing *Blue & Gold*, 492 F.3d at 1313, and *Inserso*, 961 F.3d at 1343).  Although DigiFlight contested the rationale for, and legality of, the plain reading of the Solicitation provision at issue in its case, the government persuasively contended that "the 'why' is immaterial when DigiFlight acceded to this determination and requirement by failing to object to these terms before submitting its proposal[.]"  *DigiFlight*, ECF No. 18 at 6-7 (arguing that "the plain language here made the profit rationale a material requirement").

Finally, as if this were all insufficient proof of just how strongly the government pressed its argument in *DigiFlight*, the government further contended in that case that "the only relevant issue that the Court must decide is a question of law across all these counts: whether the solicitation made the profit rationale a requirement *that cannot be cured through clarification*.  If so, then all three counts must be dismissed because no set of facts entitle DigiFlight to relief as a matter of law."  *Id.* at 10 (emphasis added).  The implication, of course, is that the government viewed the protester's omission as so fatal to its proposal that the defect could not be cured through mere clarifications; only the receipt of a new proposal or discussions could cure the problem, and the Agency vigorously denies that it engaged in the latter.  *Id.* at 9.  Thus, rather than seeking clarifications or leveraging discussions, the Agency with respect to the required price rationale simply ignored the applicable mandatory Solicitation provisions in accepting perhaps as many as 30 ineligible offerors (spanning Pools 1 and 3).  The government cannot have it both ways – arguing that it properly excluded DigiFlight from the competition based upon the plain language of a mandatory Solicitation requirement, while arguing in this case that almost identical language may simply be reinterpreted, as if it were a work of modern art, to produce a different outcome.

---

[26] *DigiFlight*, 150 Fed. Cl. at 661 ("While this Court notes that FAR 15.404-4(c)(5) *does* appear to mandate that contracting officers shall not require contractors to submit supporting rationale for profit, and this Court does not necessarily understand why GSA's Solicitation included such a requirement, nonetheless the Solicitation included the profit rationale requirement, of which DigiFlight was clearly aware. Federal Circuit precedent requires this Court to find DigiFlight's post-award challenge to that requirement is barred as untimely." (emphasis in original)).

Although the Court independently has concluded in this case that the government's interpretation of the Solicitation is erroneous as a matter of law, the Court further exercises its discretion and applies judicial estoppel to preclude the government from invoking its newly inspired, creative reading of the nearly identical Solicitation language addressed in *DigiFlight*. *Data Gen.*, 78 F.3d at 1565 (noting that "[t]he decision whether to invoke judicial estoppel lies within the court's discretion"); *see Transclean Corp.*, 474 F.3d at 1307 ("[A] party may be judicially estopped from asserting clearly inconsistent positions on claim construction, which is a question of law."). All of the judicial estoppel factors are met here: (1) as demonstrated above, the government's position in this case is the very opposite of the position it took in *DigiFlight*; (2) the Court (and, indeed, the same undersigned judge) adopted the government's previous position;[27] and (3) permitting the government to switch its position would be the height of unfairness, particularly where ensuring the consistent treatment of offerors within the same procurement is a prime purpose not only of the FAR, but also of this Court's procurement protest jurisdiction. FAR 1.602-2(b); *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 88 n.17 (2020); *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 413 (2018) (holding that "[f]airness in government procurements is enshrined in a number of FAR provisions[,]" including FAR 1.602–2(b)); *Alion Sci. & Tech. Corp. v. United States*, 74 Fed. Cl. 372, 376 (2006) ("It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations.").[28]

---

[27] *DigiFlight*, 150 Fed. Cl. at 660 ("DigiFlight failed to provide information that the Solicitation required offerors to provide in their initial proposals, the Solicitation clearly explained that GSA would exclude an offeror from the competition if the offeror did not provide the information, and GSA excluded DigiFlight for that exact reason (as the Agency was required to do).").

[28] With respect to the estoppel issue, the Court notes that DigiFlight has appealed this Court's decision to the Federal Circuit. *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650 (2020), *appeal docketed*, No. 21-1486 (Fed. Cir. Jan. 4, 2021). Although the Court stands by its decision in that case – both in terms of having reached the correct result and as being consistent with the outcome here – we are quite sure that DigiFlight will be interested to learn that the government more-or-less adopted DigiFlight's view of the Solicitation in this litigation. The government here attempts to distinguish *DigiFlight* on the grounds that it involved a protester's failure to include a rationale for a profit that was *above* the high-end of the specified profit range, 150 Fed. Cl. at 654. But that proposed distinction addresses neither the mandatory nature of the Solicitation language nor the *Blue & Gold* problem; rather, it addresses only the degree to which enforcing the mandatory language supposedly would vindicate a greater substantive purpose. But, again, in *DigiFlight*, the government specifically argued, and the Court agreed, that the *why* of the mandatory provision was irrelevant pursuant to *Blue & Gold*. The Court either does not understand or fails to appreciate what appear to be the government's situational ethics.

### iii.  *The Agency Cannot Hide Behind Corrective Action*

Finally, the government maintains that "[e]ssentially, what WaveLink is challenging is the agency's corrective action, contending that it should have been broader in scope" such that the Agency should have requested unlimited proposal revisions.  Def. Reply at 17.  The Court is unsure of the precise contours of the government's argument.  If the government is arguing that its revised reading of the Solicitation is entitled to deference because it was undertaken as part of corrective action, the Court rejects that assertion.

As explained *supra*, GSA eliminated several offerors from Pool 1 for proposing direct labor rates that did not comply with the Solicitation's requirements in sections L.5.6.(h) and M.5.4.(f).  AR 6821; *see, e.g.*, AR 9156 (GSA explaining that "[u]pon review of your proposal, numerous Labor Categories were outside the ranges identified in J.2. Attachment (2) with no rationale document included with your proposal" and that because "your rates are indisputably outside the range and no rationale was provided with your proposal submission the Government is unable to determine your proposal fair and reasonable based on the criteria set forth in Section M.5.4(f)").  The Agency explained to the eliminated offerors the rationale for its decision to exclude them, as follows:

> It is the sole responsibility of the Offeror to submit a proposal for consideration which demonstrates compliance with the solicitation. Acceptance of the rationale provided as part of your clarification response after receipt of proposals would constitute either discussions or a late proposal modification. The Government does not intend to conduct discussions and no revision to your proposal will be accepted. After a review of your proposal and response to clarifications, . . . your proposal was eliminated from further consideration.

AR 9156, 9209, 9534.  These offerors then filed GAO bid protests to challenge their exclusion from the procurement.  AR 9120–34, 9355–57, 9524–26.

The Agency moved to dismiss one of the GAO protests as untimely.  AR 9168-9172.  Just as the government did in *DigiFlight*, the Agency argued that the GAO protest was nothing more than "an untimely challenge to the Solicitation's requirements regarding determination of fair and reasonable prices."  AR 9168.  The Agency specifically asserted that the protester "failed to heed clear warnings regarding direct labor rate submissions, resulting in its exclusion" and that "[t]his protest is a post hoc attempt to circumvent the evaluation methodology as announced and applied to [the]

nonconforming proposal."  AR 9169 (arguing that the protester "provided no factual basis to establish that GSA failed to follow the stated evaluation methodology").  GSA's position before GAO mirrors that of the government before this Court in *DigiFlight*:

> The Solicitation was clear: specific rates were provided in Section J.2; the "low end" and the "high end" were defined; offerors were advised that the basis for fair and reasonable prices were these ranges; offerors were strongly advised that if they did not meet one or more of these parameters they were to provide a clear and convincing rationale to support the proposed rates; and offerors were further cautioned that failure to provide a clear and convincing rationale to support a lower or higher direct labor rate "will result" in a determination the rates are not fair and reasonable.

AR 9171.  The protester opposed the Agency's dismissal request with a lengthy filing. AR 9173–82.  GAO, in a single page decision with virtually no analysis, denied the government's dismissal request "[a]t this time[,]" thus presumably reserving the issue for a possible later determination.  AR 9346.  GAO summarized the protester's lengthy arguments in but a few sentences, concluding without explanation that "[t]he agency's interpretation of the terms of the solicitation is a matter that we will resolve on the merits."  *Id.*  Why the protest was timely at all, GAO does not explain.  Several days later, the Agency notified GAO it would take corrective action, as follows:

> GSA will re-evaluate Protester's direct labor rates for fairness and reasonableness. In conducting this re-evaluation, GSA will not consider direct labor rates that are below the ranges provided in the Solicitation as unfair or unreasonable. GSA's corrective action resolves all Protest grounds and renders the Protest academic.

AR 9347.  In light of that representation, GAO dismissed the protest as academic absent any further guidance as to how the asserted corrective action would be implemented or whether it could be done without creating yet further procurement irregularities.  AR 9349-50; *see* AR 9512–13, 9675–76 (dismissing similar protests following identical corrective action); *see also* AR 9117.

To be sure, the Court agrees that where an agency implements a recommendation contained in a GAO protest decision, the Court should review with deference subsequent agency action in compliance with that recommendation, assuming the Court concludes that GAO's decision was itself rational and consistent

with law.  *Honeywell, Inc. v. United States*, 870 F.2d 644, 647 (Fed. Cir. 1989); *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009);[29] *Firth Const. Co., Inc. v. United States,* 36 Fed. Cl. 268, 272, 276 (1996) (explaining that "if the GAO's advice is rational, it is not arbitrary or capricious to follow it" but concluding GAO advice was, in fact, irrational because "GAO draws a legal conclusion with no principled support").[30]

In this case, GAO did not recommend a course of action as part of resolving a protest, but rather simply dismissed the protest of an otherwise ineligible offeror due to the Agency's "corrective action" – in quotes because the Agency erred in effectively reading the mandatory provision at issue out of the Solicitation.  The Court is unsure why the Agency decided to throw in the towel on its well-grounded GAO protest dismissal request.  Although GAO denied the Agency's request for dismissal (while apparently reserving the issue), GAO declined to undertake any critical examination of the Agency's proposed corrective action, resulting in arguably more problems than were resolved.  In any event, GAO did not recommend any course of action that the Agency followed, and thus the type of deference contemplated in *Honeywell* is inapplicable.

If, on the other hand, the government is arguing that its decision to accept the non-compliant proposals is itself entitled to greater deference *per se*, merely because the government did so as part of putative corrective action, the Court rejects that conclusion as well.  Again, the Court agrees – as it must – that corrective action generally need only be reasonable and address a *legitimate* procurement defect.  *Dell Fed. Sys.*, 906 F.3d at 998 ("The Army was not legally required to address every option, but rather to provide a reasonable corrective action and adequately explain its reasoning for doing so.").  In *Dell Federal*, for example, the Federal Circuit upheld "corrective action" where it was "rationally related to the *undisputed* procurement defect of originally failing to conduct pre-award discussions, as reasonably interpreted by the agency to be required by the applicable regulations, in the first instance."  *Dell Fed. Sys.*, 906 F.3d at 996 (emphasis added); *see also id.* at 999 ("we hold that the original corrective action was rationally related to the procurement defect").  In this case, however, the Court concludes that there was no procurement defect – "undisputed" or otherwise – in the Agency's initial rejection of the non-compliant proposals.  Particularly in the absence of any persuasive

---

[29] Notably, in *Centech*, the Federal Circuit, finding that the agency properly followed GAO's recommendation, concluded that "[s]ince Centech's proposal did not offer to provide what the RFP requested, it was not responsive to the RFP.  It therefore was unacceptable and could not serve as the basis for contract award."  554 F.3d at 1039.

[30] If the GAO recommendation is, for example, plainly contrary to a statutory or regulatory requirement, that decision is irrational, and an agency action is not justifiably based upon it. *Grunley Walsh Int'l, LLC v. United States,* 78 Fed. Cl. 35, 44 (2007).

explanation distinguishing the government's approach here from its view of the Solicitation language in *DigiFlight*, the Court rejects the government's attempt to hide behind corrective action.

In sum, given that this corrective action argument was not well-developed by the government, that GAO did not explain its rationale for denying the Agency's dismissal request, that the Agency did not provide an explanation for taking corrective action, and that its position here conflicts with the government's position in *DigiFlight*, the Court declines to accord the corrective action any deference in this case. As explained above, the Court instead concludes that, as a matter of law, the plain language of the Solicitation governs just as it did in *DigiFlight*, and that the government accordingly violated the terms of the Solicitation and the FAR when it awarded contracts to offerors that submitted non-compliant proposals.

### 2. Wavelink Demonstrates Prejudice In Pool 3, But Not Pool 1

The Court's determination that GSA violated the Solicitation and the FAR does not end the Court's inquiry because "'to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009) (quoting *Data Gen.*, 78 F.3d at 1562). WaveLink alleges that had the Agency applied the Solicitation provision as written – as the Agency was required to do – WaveLink would have received a contract award because at least 14, and perhaps as many as 20, successful offerors should have been ineligible for award in Pool 3. Am. Compl. at ¶ 89 (asserting that "[i]f the previously listed offerors had been ineligible for award, then WaveLink's proposal would have been in line for award"); Pl. Supp. Br. at 12 n.12, 15, 22 (identifying 20 non-compliant proposals ahead of WaveLink). In other words, after subtracting out the ineligible offerors, a re-ranking would have placed WaveLink in the award range. Pl. Supp. Br. at 11-12. That argument, however, "concerns only Pool 3" where "WaveLink's initial score was high enough that, if GSA had simply complied with the Solicitation as written, WaveLink would have possessed a substantial chance of award, *even without an opportunity to update its proposal or increase its score*." *Id.* (emphasis in original); *see also* Def. Supp. Br. at 3.

With respect to Pool 1, WaveLink further asserts that it "has been prejudice[d] because the GSA should have amended the solicitation" – presumably to remove the mandatory ineligibility language in order to consider otherwise ineligible offers – and that if GSA had done so, "WaveLink would have been able to update its past performance/experience thus raising its score beyond the threshold to be selected for

award." Am. Compl. at ¶ 88.[31]  This argument "is based upon the contention that GSA's failure to amend the Solicitation deprived WaveLink of an opportunity to submit a revised proposal that would have possessed a substantial chance of award."  Pl. Supp. Br. at 11.

### i.    Pool 3

To establish prejudice on the merits, a plaintiff need not show that, but for the procurement errors, "it would *win* the contract in competition with other hypothetical bidders." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015) (emphasis in original). "Rather, all a protester must establish to demonstrate prejudice is that it has a substantial chance of receiving the contract—that it is a qualified bidder and could *compete* for the contract."  *Id.* (emphasis in original).  In *Tinton Falls*, the Federal Circuit agreed with this Court that a plaintiff's "distinct possibility" of winning a contract – assuming an agency were "required to rebid the contract" or, presumably, to reevaluate offerors – provided a sufficient basis to find prejudice. *Id.* at 1359.  Indeed, in that case, notwithstanding that there was "much speculation as to whether [the agency] would rebid the solicitation on an unrestricted basis—thus allowing Tinton Falls to compete for the contract"— the mere fact "that this [was] at least a realistic possibility" was sufficient for the Federal Circuit to conclude that the plaintiff possessed standing and demonstrated prejudice. *Id.* at 1359-60.

WaveLink demonstrates that it is prejudiced by the government's error.  In Pool 3, the Agency intended to award only 160 contracts unless there were a tie for the last slot, in which case all tied offerors would be awarded a contract.  AR 388.  GSA awarded 163 contracts, including an additional three offerors that tied for the final slot with a score of 6,350.  AR 6996, 7005.  Nineteen unsuccessful offerors were ranked ahead of WaveLink.  AR 9081.  WaveLink identifies 18 actual awardees and two unsuccessful offerors ([**] and [**]) that did not comply with the RFP's direct labor rate provision.  Pl. Supp. Br. at 12 n.12 (citing AR 9081).  Had GSA excluded those contractors (and subtracted the three additional contract awards due to the ties), "GSA would have then needed to select the next 15 highest ranked offerors to achieve 160 awards."  *Id.* at 13.  Accordingly, a re-ranking of the offerors and awarding the contracts to the next highest-ranked 15 offerors would have still left two unsuccessful offerors ahead of WaveLink.  *See* AR 9081.  Notably, those two offerors ([**] and [**]) tied with a score of [**].  *Id.*  In that regard, WaveLink, with a score of [**], would only be one spot removed from an award, and even that critically *assumes* that the rankings as explained

---

[31] Although this prejudice argument applies with equal force to Pool 3, the Court only addresses this argument with respect to Pool 1 because, as explained *infra*, WaveLink establishes a stronger prejudice case in Pool 3 without this argument.

in the source selection documents would be maintained following the point verification process.  By definition, an assumption is speculative, and insufficient basis to reject WaveLink's claims.  *In re Bed & Breakfast Registry*, 791 F.2d 157, 159 (Fed. Cir. 1986) (concluding that a "speculative assumption" is "an inadequate basis for [a] legal conclusion").

Moreover, WaveLink contends that it should have been ranked within the top-160 because three of the unsuccessful offerors ahead of it were identified on the Agency's evaluation spreadsheet as subject to "[r]emoval" from the competition.  Pl. Supp. Br. at 15 (citing AR 9081).  The government counters that these three offerors were merely marked for clarifications and that "those notations do not mean that an offeror was or would have been removed from the competition."  Def. Supp. Br. at 13–14.  At oral argument, however, the Court discussed at length with the parties the various factual discrepancies in the administrative record regarding some of the unsuccessful offerors ranked ahead of WaveLink and the removal notations.  *See* Supp. Oral Arg. Tr. at 5–40.  The Court was inclined to accept the government's explanation as it related to one of those offerors ([**]); but, while the government asserted that another offeror ([**]), in fact, had not been removed, the government was unable to support its assertion with the administrative record.  *Id.* at 38–39.

The Court need not definitively resolve the status of these offerors because, in any event, WaveLink's prejudice case is at least as strong as the plaintiff's in *Tinton Falls*.  Removing many of these offerors from the Agency's initial ranking of offerors places WaveLink if not within the contemplated award range (*i.e.*, the top 160 offerors), then at least "within the zone of active consideration."  *Allied Tech. Grp.*, 649 F.3d at 1326 (quoting *Statistica*, 102 F.3d at 1581) (internal citations omitted).

The government contends, however, that "an offeror cannot establish prejudice when its ranking falls outside the contemplated number of awards, and thus would not be next in line for consideration."  Def. Supp. Br. at 15.  The problem with the government's view of the record is that, as explained above, it is far from clear whether or not WaveLink would be "next in line for consideration," *id.*, because outside of the initial set of awardees, offerors only *self-scored* their respective technical evaluations.  AR 359, 490, 1268.  As the Court explained with respect to the government's motion to dismiss for lack of standing, *see supra* Section II, the government did not audit or otherwise attempt to verify scores outside of the awardees.  Accordingly, there is no way for the Court (or either party) to know definitively what the outcome would have been if the Agency correctly had determined 20 offerors to be ineligible and then reranked and evaluated the remaining offerors.[32]  In that regard, the government all but

---

[32] *See* Supp. Oral Arg. Tr. at 27:7-13 ("**THE COURT:** But these -- the 20-plus offerors on page 15

concedes that a "'potential re-ranking' could place WaveLink within the contemplated number of award[s.]" Def. Supp. Br. at 15. Indeed, at oral argument, the government unequivocally admitted that it has no any idea where WaveLink would actually be ranked following a remand to remove ineligible offerors and that it is possible that WaveLink would be in position for an award.[33] That is more than sufficient for a finding of prejudice. *Info. Tech.*, 316 F.3d at 1319 (holding that that plaintiff "has established prejudice (and therefore standing)" where it "ha[s] greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest"); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003) ("protestor must have been in the zone of active consideration and had a reasonable likelihood of securing the award" (citing *Alfa Laval*, 175 F.3d at 1367, and *Data Gen.*, 78 F.3d at 1562)).[34]

Relying upon *Octo Consulting Group, Inc. v. United States*, 117 Fed. Cl. 334, 353 (2014), the government maintains that such uncertainty is "insufficient to demonstrate prejudice." Def. Supp. Br. at 4–5, 15. The government does not develop its argument further and does not cite any binding authority that precludes a finding of prejudice here. In any event, *Octo Consulting* is readily distinguishable. In that case, the plaintiff admitted that it had "'no specific knowledge' of any mistakes in the other evaluations by the agency in any of the ten other proposals, making its claims *entirely speculative*." *Octo Consulting*, 117 Fed. Cl. at 353 (emphasis added). Not only does WaveLink make no such admission, but also, as noted above, the government never evaluated the unawarded offerors it asserts were ahead of WaveLink. *See* AR 389; Pl. Supp. Reply at 9. At a minimum, the Court is convinced that WaveLink is correct that the Agency erred in not applying mandatory Solicitation language. Thus, unlike in *Octo Consulting*, there is no question about whether there has been a "mistake[] in the . . . evaluation[]." 117 Fed. Cl. at 353. The only question, then, is with respect to the likely *impact* of that error. Based on the administrative record, there is a realistic possibility that WaveLink could secure an award if the ineligible offerors are removed. Thus, in contrast to the protester's claims in *Octo Consulting*, WaveLink's claim is not "entirely speculative."

---

of Plaintiff's initial supplemental brief, ECF 9 [at] 46 -- . . . were those fully evaluated or not? **MS. SINANI:** They were not.").

[33] *See* Supp. Oral Arg. Tr. at 28:4-11 (**THE COURT:** But now what you're saying is that . . . since these [20 offerors] are not fully evaluated, it's possible that . . . those might not be accurate scores; Wavelink could be ranked number eight. You don't know. **MS. SINANI:** We don't know that. That's correct, Your Honor.").

[34] "It is important to note that a plaintiff need not establish strict but-for causation in order to meet its burden of demonstrating that the agency's procurement violation was prejudicial." *Red River Commc'ns, Inc. v. United States*, 109 Fed. Cl. 497, 503 (2013) (citing *Data Gen.*, 78 F.3d at 1562).

Defendant-intervenor NetCentric argues that "[f]or decades, the GAO has repeatedly rejected protesters' assertions that they were prejudiced by a permissible but unannounced waiver simply because, without the waiver, higher-rated offerors would have been ineligible for award[.]" NetCentric Br. at 7–8. Citing a string of GAO decisions, NetCentric contends that the relevant prejudice inquiry is "'whether the protester would have submitted a different [proposal] that would have had a reasonable possibility of being selected for award had it known that the requirement would be waived.'" *Id.* (emphasis omitted) (quoting *Illustrious Consultants*, B-416914, 2018 CPD ¶ 434, 2018 WL 6839370 (Dec. 28, 2018)). These GAO decisions all involve protests where the protester would have been next-in-line for an award had it successfully challenged the awardee's non-compliant offer. *See Illustrious Consultants*, B-416914 at *1; *Shuttlewagon Inc.*, B-419518, 2021 CPD ¶ 172, 2021 WL 1750395, *2 (Apr. 15, 2021); *Glem Gas S.p.A.*, B-414179, 2017 CPD ¶ 60, 2017 WL 730529, *2 n.2 (Feb. 23, 2017); *Geonex Corp.*, B-274390.2, 1997 CPD ¶ 225, 1997 WL 354727, *1 (June 13, 1997). As WaveLink proposed all its direct labor rates within the RFP's specified ranges and altering those rates would not have made its proposal more competitive (given the nature of the evaluation scheme), NetCentric argues that WaveLink was not prejudiced by GSA's decision to award contracts to other offerors that proposed rates outside the RFP's ranges. NetCentric Br. at 6–8.

While the Court acknowledges that NetCentric appears to be correct about GAO's approach, it is inconsistent with the Federal Circuit's decision in *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). In *Alfa Laval*, the Federal Circuit held that the protester was prejudiced by the Navy's ignoring a mandatory solicitation requirement for the contract awardee. *Id.* at 1368. As the protester and the awardee were the only two offerors competing for the contract, the Federal Circuit reasoned that because "[t]he only bid competing with Alfa Laval was unacceptable under the standards set out in the RFP[,]" the protester "ha[d] a substantial chance to receive the contract award." *Id.* Critically, in evaluating prejudice, the Federal Circuit did not analyze how the protester would have altered or otherwise improved its offer.[35] Simply put, *Alfa Laval* stands for the straightforward

---

[35] Several defendant-intervenors, NetCentric Br. at 6–7, RED Br. at 6, Nova Br. at 5, attempt alternatively to ground their prejudice arguments in a quote from *Electronic Data Systems, LLC v. United States*, 93 Fed. Cl. 416 (2010), in which Judge Allegra noted that "[s]everal cases hold that, to demonstrate prejudice in the context of a failed amendment, the protestor must show that it would have altered its proposal to its competitive advantage had it been given the opportunity to respond to an altered requirement." *Id.* at 435–36 (internal quotation marks omitted). In *Electronic Data Systems*, however, the Court grappled with *Alfa Laval* and concluded that the protester was not prejudiced by the agency's failure to amend the solicitation because "the impact of that error was dwarfed by the huge price differential between the relevant proposals and more than offset by the adjustments made by the [Source Selection Authority] in his best

proposition that when an agency seeks proposals that meet certain criteria, an offeror that submits a fully compliant offer (and is still in the zone of consideration, as explained, *supra*) is prejudiced when the contract is awarded to a non-complaint offeror. *See, e.g.*, *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 51–52, 57–58 (2005) (applying *Alfa Laval*).

Several defendant-intervenors contend that they were properly awarded a contract (thus effectively mitigating the prejudice to WaveLink) because they explained their low direct labor rates in the required professional employee compensation plan as part of their proposals.  ISYS Br. at 6, Kalman Br. at 2, NetCentric Br. at 4–5, Nova Br. at 2–3, GaN Br. at 3.  Whether an offeror's specific professional employee compensation plan complied with the Solicitation's requirement to provide a "clear and convincing rationale" is a factual question for the Agency to consider in the first instance, and not for this Court to resolve.  The Court, however, observes that:  (1) GSA never reviewed compensation plans to determine whether they provided the required rationale for rates outside the specified ranges because, following corrective action, any direct labor rate below the range was determined to be "fair and reasonable" *per se*, AR  7109, 7112; and (2) indeed, prior to corrective action, GSA expressly rejected NetCentric's attempt to rely upon its compensation plan as a clear and convincing rationale for its direct labor rates below the RFP's set labor rate ranges.  AR 9156–57.  Accordingly, at least on the record as it currently stands, the Court is skeptical that defendant-intervenors could rely upon the compensation plans to save their contract awards and, thus, at this stage, the Court concludes that they do not undermine WaveLink's prejudice case.

Accordingly, with respect to Pool 3 of the instant procurement, the Court holds that WaveLink was prejudiced by the Agency's improper consideration of, and award of contracts to, offerors that should have been excluded from the procurement pursuant to the plain language of the Solicitation.

### ii.    Pool 1

With respect to Pool 1, where GSA awarded contracts to 12 offerors that did not comply the RFP's direct labor rate provision, *see* AR 6839–40, 6906–09, 6912, 6914, 6922, 6927, resolving WaveLink's prejudice argument is considerably more complicated.

---

value determination." *Elec. Data Sys.*, 93 Fed. Cl. at 438–39.  In sum, Judge Allegra only addressed a situation where "even if the disappointed bidder could have revised its proposal in light of the Government's errors, any such differences would have been inconsequential given the dramatic price difference[.]"  *Allied Tech. Grp., Inc. v. United States,* 94 Fed. Cl. 16, 47 (2010) (applying *Electronic Data Systems* to a factually similar case), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011).

Ultimately, the Court agrees with the government that WaveLink has not met its burden to demonstrate prejudice in Pool 1.

As explained above, the Agency had three options with respect to non-compliant proposals: (1) amend the Solicitation in accordance with FAR 15.206(d), (2) engage in discussions (*i.e.* negotiate) with non-compliant offerors to get them to meet the requirements, or (3) reject the proposals. With respect to Pool 3, WaveLink was prejudiced because the Agency did none of those things and the improper awards may well have cost WaveLink an award. In contrast, in Pool 1, even if the Agency had rejected the non-compliant offerors, as the Agency was required to do (*i.e.*, in the absence of a Solicitation amendment or further negotiations and the submission of revised, compliant proposals), WaveLink *admits* that it would *not* have secured a contract award. Pl. Supp. Br. at 11–12. Thus, WaveLink takes a different attack angle, arguing that it would have had a substantial chance at an award in Pool 1 if the Agency properly (1) had amended the Solicitation to delete sections L.5.6.(h) and M.5.4.(f), *and* then (2) had permitted all offerors to submit full, unlimited proposal revisions (akin to a FPR following discussions). WaveLink maintains that the Agency was required to do both here. Pl. MJAR at 26–32; Pl. Supp. Br. at 23–25.

There certainly is some facial appeal to WaveLink's argument. In that regard, FAR 15.206 provides, in relevant part:

> (a) When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer ***shall*** amend the solicitation.

> (b) Amendments issued before the established time and date for receipt of proposals ***shall*** be issued to all parties receiving the solicitation.

> . . . . .

> (d) If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer ***shall*** amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection (see 15.207(b) and 15.306(e)).

FAR 15.206 (emphasis added). Thus, it would seem, where an agency accepts a proposal that does not comply with solicitation requirements, the agency may be

viewed as violating two FAR provisions: (1) FAR 15.305(a), mandating that the agency follow solicitation requirements (which violation was prejudicial to WaveLink in Pool 3, as demonstrated above); and (2) FAR 15.206, mandating that the agency amend the solicitation prior to accepting an otherwise non-compliant proposal.[36]

The analytical difficulty is that the prejudice analysis is arguably different for the two violations. For a violation of FAR 15.305(a), the appropriate prejudice question is whether, but for an agency's award to ineligible offerors, the plaintiff protester would have had a substantial chance of receiving a contract award. For a violation of FAR 15.206, on the other hand, the relevant inquiry is whether the agency's failure to amend the solicitation effectively precluded the plaintiff protester from submitting a revised proposal, which revision, in turn, would have provided the protester with a substantial chance of receiving an award. The latter inquiry, of course, requires another degree of speculation about what might have happened "but for" the government's challenged conduct. That is, would the nature of the RFP amendment have required the Agency to permit offerors to submit an unrestricted, revised or updated proposal (*i.e.*, essentially a FPR)? Recognizing this problem, the government responds to WaveLink's argument regarding FAR 15.206 with a two-prong parry. First, the government maintains that because "GSA did not relax the requirements with respect to direct labor rates that were below those provided in Section J.2 . . . , no amendment was necessary." Def. Reply at 16. Second, the government asserts that "WaveLink does not offer any support for why it would have been allowed to change its past experience and performance *even if* the agency amended the solicitation to allow for different pricing." Def. MJAR at 38 (emphasis in original). While the Court rejects the government's first argument – at least with respect to Pool 3 – we agree with the second argument as applied to Pool 1.

To recap, the Court agrees with the basic premise that the government's contract awards to ineligible offerors violated the terms of the Solicitation, FAR 15.305, and FAR

---

[36] In *Elec. Data Sys., LLC v. United States*, this Court explained as follows:

> "It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." This requirement is rooted in the Competition in Contracting Act (CICA) and the Federal Acquisition Regulations (FAR), both of which indicate that an agency shall evaluate proposals and assess their qualities solely based on the factors and subfactors specified in the solicitation. If the agency changes any evaluation criterion after issuing the solicitation, it must amend the solicitation and notify the offerors of the changed requirement.

93 Fed. Cl. 416, 430 (2010) (quoting *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)) (other citations omitted).

15.206.  But those violations are not prejudicial, *per se*, to WaveLink in Pool 1 because removing the ineligible offerors from the procurement would not come close to yielding an award to WaveLink.  *See* AR 6803–06 (identifying 72 offerors ahead of WaveLink). Indeed, WaveLink concedes this point.  *See* Pl. Supp. Br. at 11.  On the other hand, the only way GSA properly could have accepted the non-compliant proposals would be through either discussions (followed by the receipt of FPRs) or via a solicitation amendment, deleting the mandatory provision at issue.  But, even if the government had done the latter, there simply is no concrete, absolute requirement that the government permit offerors to submit a completely new proposal (*i.e.*, to include, in this case, new updated experience references and a revised self-score).  Accordingly, just as the government cannot defeat WaveLink's claim with respect to Pool 3 by speculating that the Agency would have issued a limited solicitation amendment, so, too, WaveLink cannot demonstrate that the government would have permitted an entirely new proposal submission in response to an amended solicitation.  Put yet differently, neither party may speculate about what an appropriate amendment would have permitted or precluded, but we *do* know that the Agency's acceptance of non-compliant proposals did not prejudice WaveLink in Pool 1.

While "an amendment to the Solicitation may trigger the duty to reenter into discussions with all offerors and permit all bidders the opportunity to modify their proposals accordingly[,]" there simply is no hard-and-fast rule that offerors must be permitted to submit entirely new, updated proposals – akin to a FPR – in response to any and all solicitation amendments.  *Portfolio Disposition Mgmt. Grp. LLC v. United States*, 64 Fed. Cl. 1, 12 (2005) (citing FAR 15.206(a) and *MVM, Inc. v. United States*, 46 Fed. Cl. 126, 131 (2000)); *Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 432 (2010) ("[T]here is no basis for such a *per se* rule—one in which every failure to amend in violation of FAR § 15.206 would inevitably lead to a corresponding failure to conduct meaningful discussions in violation of FAR § 15.306.").  Rather, such a blanket right to submit a FPR arises only in the case of "major modifications—changes that could result in a substantially different proposal by those competing for the contract."  *Portfolio Disposition Mgmt. Grp.*, 64 Fed. Cl. at 12 (citing *AT & T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993) (new bids required only where modifications are outside the scope of original competed contract)); *Elec. Data Sys.*, 93 Fed. Cl. at 432–33 ("[T]he failure to amend a solicitation leads to the violation of the discussion regulation only where: (i) application of the modified requirement would give rise to an unacceptable deficiency or convert a portion of a proposal into a significant weakness; (ii) the effective modification in requirements is discussed with the awardee, but not with the relevant offeror; or (iii) a failure to conduct discussions would prejudicially mislead an offeror.").

Accordingly, WaveLink has the burden to demonstrate, specifically, that the Agency would have been required to permit WaveLink to address the impact of a putative amendment, such that WaveLink would have been able to update its self-score and the bases for that score. *Ocean Ships, Inc. v. United States*, 115 Fed. Cl. 577, 591 (2014) (holding that "plaintiff was obligated to provide a concrete explanation of how amending the RFP to account for [a] 'change' would have led to an improved competitive position"). WaveLink cannot simply assert that the Agency as a matter of law would have been required to accept entirely new and improved, updated proposals. *Consol. Eng'g Servs.*, 64 Fed. Cl. at 639–40. In that regard, the prejudice inquiry requires a protester to demonstrate a nexus between a solicitation requirement that the Agency erroneously did not amend (or delete) and the proposal content that the protester would have altered had it been informed of the solicitation change. *See Aerosage, LLC*, B-415607, 2018 CPD ¶ 11, 2018 WL 272778 (Jan. 3, 2018) (denying protest where "[t]he protester has not asserted that, let alone substantiated how, it would have reduced its unit pricing by an amount that would have overcome the awardee's price advantage" and finding that an "unsupported speculation that the change in delivery schedule could have impacted its proposed price is insufficient to establish competitive prejudice"); *Triad Logistics Servs. Corp.*, B-406416, 2012 CPD ¶ 118, 2012 WL 937389 (Mar. 19, 2012) (rejecting protest where "the protester has offered no evidence to establish that it was prejudiced by the agency's failure to shorten the base period through the issuance of an amendment" and where "[t]he protester has not asserted that it would have reduced its unit pricing by an amount that would have overcome the awardee's price advantage"); *Northrop Grumman Tech. Servs., Inc.*, B-291506, 2003 CPD ¶ 25, 2003 WL 214056 (Jan. 14, 2003) (denying protest where "Northrop Grumman has not shown how it was prejudiced by the Army's failure to amend the RFP" because "Northrop Grumman has not shown that it would or could have materially improved its competitive position, even if it had amended its proposal presuming the elimination of the commercial helicopter requirement and the provision of the UH-1 helicopters as [government-furnished property]").

The problem for WaveLink, of course, is that the mandatory Solicitation provision to which the Agency failed to adhere assuredly did *not* negatively impact *the proposal* WaveLink submitted. That is precisely why WaveLink begins with the mistaken premise that *any* amendment of the Solicitation would have required the Agency to permit WaveLink to submit a completely revised proposal, including updated relevant experience references. WaveLink points to no binding authority, however, that supports such a broad rule. To the extent there is some case law supporting such a rule,[37] that is perhaps because the previous version of FAR Part 15

---

[37] *See Saratoga Dev. Corp. v. United States*, 777 F. Supp. 29, 38 (D.D.C. 1991) ("Numerous opinions of the Comptroller General have sustained protests of the award of contracts where the offerors

apparently *did* contain such a requirement.  Prior to 1997, FAR 15.606(c) provided that "[i]f the proposal considered to be most advantageous to the Government (as determined according to the established evaluation criteria) involves a departure from the stated requirements, *the contracting officer shall provide all offerors an opportunity to submit new or amended proposals* on the basis of the revised requirements." (emphasis added).  *See also Federal Acquisition Regulation; Part 15 Rewrite – Phase I*, 61 Fed. Reg. 48380-01, 48386 (Sept. 12, 1996) (proposed FAR 15.205(f), requiring that "the contracting officer shall provide all offerors an opportunity to submit new or amended proposals on the basis of the revised requirements").  This broad language was deleted from the FAR, however, as a part of a final rule issued in late 1997.  *See Federal Acquisition Regulation; Part 15 Rewrite; Contracting by Negotiation and Competitive Range Determination*, 62 Fed. Reg. 51224-01, 51235 (Sept. 30, 1997) (Final Rule) (promulgating FAR 15.206(d), deleting proposed 15.205(f) requirement that the contracting officer "provide all offerors an opportunity to submit new or amended proposals on the basis of the revised requirements").

In sum, the current FAR provision does not contain the requirement that previously existed in FAR 15.606(c).  Thus, WaveLink has pointed to no concrete basis upon which the Court may conclude that the Agency has a *per se* obligation to permit all offerors to submit completely new or amended proposals just because the Agency amends a solicitation in some respect.  Rather, the degree to which an agency must permit the submissions of revised proposals depends upon whether a protester can show that the addition or deletion of a requirement or evaluation factor somehow prejudiced the protester in the sense that it would have submitted a more advantageous proposal with a substantial chance of winning a contract award had it known the agency's true requirements or evaluation factors.  WaveLink made no such showing in this case with respect to Pool 1.

---

were given no opportunity to respond to the deletion or relaxation of selection criteria."), *aff'd*, 21 F.3d 445 (D.C. Cir. 1994); *FKW Inc. Systems*, B-235989, 89-2 CPD ¶ 370, 1989 WL 241269 (Oct. 23, 1989) ("Where, as here, an agency changes the ground rules or evaluation criteria of an RFP after proposals are received, all offerors within the competitive range should be given the opportunity to revise their proposals based on the new criteria. However, we will only sustain a protest on this basis where this change affected the selection decision or otherwise was prejudicial to the protester(s)." (internal citations omitted)); *TMC, Inc.,* B-230078, 88-1 CPD ¶ 492, 1988 WL 227160 (May 24, 1988) ("When an agency's changed needs create a material discrepancy between an RFP's statement of the agency's requirements *or the ground rules under which a procurement will be conducted* and the agency's actual needs, all offerors within the competitive range should be given an opportunity through appropriate discussions to revise their proposals accordingly." (emphasis added)).

## V.    Injunctive Relief

The Tucker Act vests this Court to award "any relief that the court considers proper, including . . . injunctive relief." 28 U.S.C. § 1491(b)(2); *see* RCFC 65. In evaluating whether permanent injunctive relief is warranted in a particular case, a court must consider:  (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest.  *PGBA v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *see CW Gov't Travel*, 110 Fed. Cl. at 494–96 (applying these four factors to an agency award of an IDIQ contract).

With regard to Pool 1, because WaveLink has failed to succeed on the merits of its various claims, the Court does not evaluate the remaining injunctive relief factors. *See Dell Fed. Sys.*, 906 F.3d at 999 ("success on the merits is a necessary element for a permanent injunction"); *Vsolvit, LLC v. United States*, 151 Fed. Cl. 678, 691 (2020) (denying injunctive relief where plaintiff failed to succeed on the merits). With regard to Pool 3, however, WaveLink has successfully demonstrated on the merits that it was prejudiced by GSA's awarding contracts to as many as 18 noncompliant offerors in violation of the Solicitation and, in turn, FAR 15.305.

In evaluating irreparable harm, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993). In the bid protest context, "[a] lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm." *Magnum Opus Techs.*, 94 Fed. Cl. at 544. Moreover, "[t]he court has repeatedly held that the loss of potential profits from a government contract constitutes irreparable harm." *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 49 (2012) (internal quotation marks omitted). Here, WaveLink was denied the opportunity to have its proposal fairly considered for an award in Pool 3, which is a prerequisite to competing for valuable task orders. The Court, thus, agrees that WaveLink will suffer irreparable harm in the absence of an injunction.

In balancing the harms, the Court notes that the government never discussed or even asserted that it would be harmed by an injunction. *See* Def. MJAR at 39 ("No need exists for the Court to consider any remaining injunctive-relief factors."); Def. Reply at 19 (failing to address the government's harm resulting from an injunction). Nor has government represented to the Court whether contract awardees in Pool 3 already have been issued task orders. Although the Court reasonably speculates that the Agency is likely to incur some hardship due to the time, cost, and administrative effort it will need to expend to revisit the Pool 3 procurement, the Court will not make this argument for

the government, particularly in the absence of any facts in the record, and where the government could have avoided this problem by not taking inconsistent positions in this case and *DigiFlight*.

The public interest also favors this Court's granting an injunction, as "the public always has an interest in the integrity of the federal procurement system." *Starry Assoc., Inc. v. United States*, 127 Fed. Cl. 539, 550 (2016) (citing *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)); *see MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system."). That is particularly true here given the government's position *DigiFlight*. The Court cannot allow the integrity of the procurement system to be undermined by the government's taking inconsistent positions on almost identical language within the same solicitation.

* * * * *

In sum, WaveLink is prejudiced in Pool 3 due to GSA's failure to enforce the Solicitation's mandatory ineligibility provision for offerors that did not submit a rationale for proposed direct labor rates that were below the RFP's ranges. GSA could have either enforced that provision as written, conducted discussions with the ineligible offerors, or, perhaps, amended the Solicitation to delete the mandatory Solicitation provision at issue. But GSA did not take any of these actions. Indeed, as noted above, defendant-intervenor GaN accurately summarized the cause of this case: "Had the Agency amended the Solicitation to be facially consistent with its commitment to GAO, this protest never would have landed on the Court's desk. But it did not, and the Court concluded that it violated applicable law by evaluating contrary to the Solicitation's terms." GaN Br. at 5 (internal footnote omitted). The Court agrees wholeheartedly with GaN.

### CONCLUSION

For all the above reasons, the Court:

1. **DENIES** the government's motion to dismiss for lack of standing;

2. **GRANTS, IN PART,** WaveLink's MJAR (relating to Pool 3) and **DENIES, IN PART,** WaveLink's MJAR (relating to Pool 1);

3. and **GRANTS, IN PART,** the government's MJAR (relating to Pool 1) and **DENIES, IN PART,** the government's MJAR (relating to Pool 3).

Accordingly, the Court **GRANTS** WaveLink's request for equitable relief in Pool 3. The Agency is enjoined from proceeding with the unlawfully awarded contracts as

explained in this opinion and order, as well as from awarding new work under such contracts until the terms of this injunction are met. Specific task orders or work already in progress, however, may be completed. To address the illegality and procurement defects identified in this opinion and order, the Agency is further directed to take one of the following actions: (1) enforce the mandatory Solicitation provision as written, *see* FAR 15.305, cancel the award to any ineligible offerors, and continue the self-score verification process to determine whether WaveLink is eligible for an award in Pool 3 following an updated re-ranking; *or* (2) engage in discussions with ineligible offerors to bring their proposals into compliance (and, relatedly, to permit all offerors to submit FPRs); *or* (3) amend the Solicitation to delete the mandatory Solicitation provisions at issue, and to fully comply with FAR 15.206, *see, e.g.*, FAR 15.206(c) (requiring notice to "all offerors that have not been eliminated from the competition"). With respect to the first option, the Agency must decide which offerors, if any, are ineligible for award after applying the Solicitation language at issue, as interpreted by the Court in this opinion. With respect to the latter two options, the government must consider in the first instance whether (a) the unlawfully awarded contracts must be terminated (with the exception of any ongoing work) and (b) there is any basis either for limiting the scope of a FPR (if the Agency selects option 2) or for precluding offerors from responding with an entirely updated, new proposal (if the Agency selects option 3).

Although the government during the June 16, 2021 status conference detailed its intended course of action in the event the Court were to reissue injunctive relief in substantially the same terms, as it does here, the Court expresses no further view on the optimum way to remedy the government's violation of the Solicitation and the FAR.[38] Thus, the Agency retains maximum flexibility within the foregoing parameters. Although the Court is mindful of its own view that an Agency's corrective action – whether voluntary or in response to an injunction – may create yet additional unanticipated protests grounds, the Court is not in a position to approve the Agency's planned course of conduct by incorporating it into this order or otherwise. In particular, for example, the Court cannot foresee what impact, if any, the government's selected remedy may have on Pool 1 offerors or awardees. *See* AR 7002. Nor, for that matter, can the Court anticipate either the (possible) prejudice any amendment, at this late date, may have on unawarded offerors or whether an amendment properly may retroactively cure, *nunc pro tunc*, awards made prior to the amendment under different solicitation terms. The government, however, should consider the ramifications of each option above and keep in mind that, depending upon the selected option, all Pools may

---

[38] On June 24, 2021, the government filed a status report laying out in detail its intended approach to meeting the terms of the previously issued, but stayed, injunction. See ECF No. 112. Because this opinion and order replaces the one previously issued, any concerns with the terms of the prior, stayed-injunction are moot.

be impacted.  *See* AR 7002.  Finally, the Court notes that this limited injunction accounts for the time and effort that the Agency previously expended in evaluating and awarding these contracts.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge